**ALFRED BELL & CO., LIMITED, v. CATALDA FINE ARTS, Inc., et al.**

District Court, S. D. New York.

Sept. 23, 1947.

974

See, also, 5 F.R.D. 327.

Guggenheimer & Untermyer, Eugene Untermyer, William J. Cohen and Rudolph E. Uhlman, all of New York City, for plaintiff.

Purdy & Lamb, Edmund F. Lamb and Anthony B. Cataldo, all of New York City, for Catalda.

Ehrich, Royall, Wheeler & Holland and James G. Holland, all of New York City, for U. S. Printing & Lithograph.

SMITH, District Judge.

The plaintiff, a British print producer and dealer, member of the Fine Arts Trade Guild, copyrighted in the United States

eight mezzotint engravings of old masters produced at its order by three mezzotint engravers.

The defendants, a color lithographer, a dealer in lithographs and the dealer's president, produced and sold color lithographs of the eight mezzotints.

The first question in the case is whether these mezzotint engravings are copyrightable under the constitutional provision [1] giving the Congress the power to legislate copyright monopolies and under the legislation [2] passed pursuant to the grant of power to the Congress. Concededly the subjects of the eight engravings are paintings by other persons than the mezzotint engravers, all of them being well-known paintings executed in the late eighteenth or early nineteenth centuries and all now in the public domain. The mezzotint method lends itself to a fairly realistic reproduction of oil paintings. It is a tedious process requiring skill and patience and is, therefore, rather expensive compared with modern color photographic processes.

The artists employed to produce these mezzotint engravings in suit attempted faithfully to reproduce paintings in the mezzotint medium so that the basic idea, arrangement, and color scheme of each painting are those of the original artist. The mezzotint engraving process is performed by first rocking a copper plate, that is, drawing across the plate under pressure a hand tool having many fine and closely spaced teeth. The tool is drawn across the plate many times in various directions so that the plate is roughened by the process. The outlines of the engraving are then placed upon the plate either by tracing with carbon paper from a photograph of the original work which it is desired to reproduce in this medium or by a tracing taken from such a photograph on gelatine sheets transferred to the copper plate by rubbing carbon black or some similar substance in the lines of the tracing on the gelatine sheet and transferring of them by pressing the sheet upon the copper plate. With the image on the roughened plate the engraver then scrapes with a hand tool the picture upon the plate, obtaining light and shade effects by the depth of the scraping of the roughened plate or ground. When the plate is completed, trial prints are taken from it and it may be altered to make the final result to the satisfaction of the engraver. When it is completed and a satisfactory proof drawn from the plate, a thin steel coating is applied to it to preserve it during the printing of the final article, of which several hundred may be drawn from such a steel-faced plate before noticeable wearing of the plate. The final product is a print in color called in the trade a proof. The color is applied to the plate by hand before each print or proof is drawn from the plate. The color may be applied to the plate by the artist, but usually is done by one or more printers who follow a sample print or color guide in applying the colored ink in the depressions made by the engraver on the plate. It is possible by this process to make quite a satisfactory reproduction of the original painting in whatever size desired (the size of the photograph governing the size of the engraving), preserving the softness of line which is characteristic of the oil painting. It is not, however, possible to make a photographic copy of the painting by this method exact in all its details. The work of the engraver upon the plate requires the individual 'conception, judgment and execution by the engraver on the depth and shape of the depressions in the plate to be made by the scraping process in order to produce in this other medium the engraver's concept of the effect of the oil painting. No two engravers can produce identical interpretations of the same oil painting. This would appear to be sufficient to meet the requirement of some originality [3] to entitle a work to the protection of the copyright law.

Congress in the Act, and the copyright office in the regulations adopted pursuant to the Act, recognize that there may be in

---

[1] Const.U.S. Art. 1, Sec. 8, Cl. 8.

[2] Act of March 4, 1909, c. 320, as amended, 35 Stat. 1075, 17 U.S.C.A. §§ 1–65.

[3] "Personality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something irreducible, which is one man's alone. That something he may copyright unless there is a restriction in the words of the act." Mr. Justice Holmes in Bleistein v. Don-

reproductions of works of art an artistic element distinct from that of the original work of art.

Such an element satisfies the purpose of the constitutional provision.

The question arises whether the "interpretation" of the original obtained by the mezzotinter in his management of the depth and form of the depressions on his plate is such an element. Examination of the three "Blue Boy's" and the two "Chateau Renaud's" reveals a distinctive difference, most noticeable in the facial expressions. True, all three "Blue Boy's" are Gainsborough's in origin, as both "Chateau Renaud's" are Nattier's, and small photographs of the mezzotints reproduced in half-tone are so difficult to tell apart that a photo of one is sometimes used to advertize another. Examination of the half-tones 1982 and 2260 in Exhibit D makes it plain that both are of "Chateau Renaud" by Wardle, Exhibit E, although 2260 purports to be of Exhibit 4a by Woollard. There are marked differences in the large flower at the edge of the bodice, the bun of hair at the nape of the neck, and in the facial expressions, between the two mezzotints. In each of these respects the half-tones both follow Exhibit E rather than 4a. It appears likely that the similarities in the half-tones of "Lady Rushout and Daughter", and in the half-tones of "La Lecon de Musique" are ascribable to a similar situation in spite of Bell's recollection that he had used half-tones of the new mezzotints in advertising them. Where we have the mezzotints themselves in evidence, the difference in handling by two engravers is noticeable.

Of course, the ideas for the subject are entirely those of the first artist, the painter. What is original with the engraver is the handling of the painting in another medium to bring out the engraver's conception of the total effect of the old master. The engraver is not trying to alter or improve on the old master. He is trying to express in another medium what the original artist expressed in oils on canvas.

It is only this treatment in another medium which is original, but it is a distinguishable effect which can itself be copied by photography. The engraver's contribution to the world's art is indeed modest, but it is his own and should be protected.

It is impossible to draw two identical proofs from the same plate since each proof is the result of a separate inking, by hand, of the plate, and the colors vary in some slight degree in each proof. They all, however, carry the same interpretation of the original, the result of the engraver's conception of the necessary shape and depth of the depressions on the plate, and may well be considered the same work rather than individual works which must each be copyrighted.

The plaintiff printed small half-tone reproductions of the mezzotint engravings in its catalogue without carrying upon these half-tones any notice of copyright. Similar half-tones were also carried in catalogues of the Fine Arts Guild. It is contended that both of these are publications without notice of copyright resulting in an abandonment of copyright. It is true that both were circulated rather widely. It is obvious, however, that it was done for advertising purposes and no other purpose. It did not mislead the defendants. It was done to acquaint the print-buying public with the availability of the mezzotint engravings for purchase and was not intended to, nor should it, result in an abandonment of copyright protection of the engravings.[4]

Mezzotints in other sizes and by other mezzotint engravers, as well as in one case a stipple engraving of one of the old masters, subjects of the engravings in suit, had been produced for, and sold by, the plaintiff prior to the production, copyright, and sale of the mezzotint engravings in suit. In view of the nature of the process, however, involving, as we have found, necessarily originality on the part of the

aldson Lithographing Co., 1903, 188 U.S. 239, 250, 23 S.Ct. 298, 300, 47 L.Ed. 460.

[4] Falk v. Gast Lithograph & Engraving Co., 1893, 2 Cir., 54 F. 890; Werckmeister v. Springer Lithographing Co., 1894, C.C., 63 F. 808; Stecher Lithographic Co. v. Dunston Lithograph Co., 1916, D.C. W.D.N.Y., 233 F. 601; Gerlach–Barklow Co. v. Morris & Bendien Co., 1927, 2 Cir., 23 F.2d 159, 162, 163.

engraver, each is a proper subject of copyright, and the publication of one does not prevent a later copyright and publication of another by the same copyright owner. It would be otherwise were the second copyright that of a second edition drawn from the same plates, for a copyright owner could not so extend the term of his copyright.[5]

Concededly the defendants used proofs taken from the plaintiff's plates and sold by the plaintiff, carrying notice of plaintiff's copyright, as the subjects of their colored photoengravings. These proofs were set up and photographed with continuous tone negatives through color filters extracting different color values on the negatives. Each of these values was transferred from the negatives through a half-tone screen to a highly-sensitized aluminum plate coated with a protective substance. The plate was then etched with acid and finally corrected by hand to give the desired half-tone result. The image on each flat original plate was then transferred mechanically to a curved printing plate. A total of nine or ten different plates was used for each lithograph, one color being printed by each printing plate, the image being transferred to a rubber blanket and thence to the paper in an offset printing-press. This is a method which might permit copyright if done of some subject in the public domain, but it was here used to copy a copyrighted subject, taking from the plaintiff the fruits of the originality of its engravers. Of course, the defendants could have gone directly to the old masters and photographed them, but this would have involved transportation of the photographic equipment, obtaining permission from the galleries and, in some cases, entry in enemy territory in time of war, not then possible. Copy of the engraving, whether it be called a copy or reproduction, was, therefore, the most feasible way of obtaining the work of the master. The difficulty is that it involved also the pirating of the work of the engraver and cannot, therefore, be considered a "fair use". The plaintiff is entitled here to protection, unless it has in some way forfeited that right by its actions.

This it is claimed to have done here, for it has contracted with the other members of the Guild to limit production of each engraving to a specified number and to destroy the plates after either the number specified or a specified period of time from the first production has been reached. It has also agreed with the other members of the Guild to maintain minimum prices for each class of customer. Obviously this is an agreement in restraint of trade. Copyright laws do not grant to copyright owners the privilege of combining in violation of otherwise valid state or federal laws.[6] The agreement is formed in England but several of its members reside in the United States and the business of the plaintiff in the United States is affected by the agreement.[7] The defendants point to one precedent for denying the protection of the legal monopoly of the copyright because of joinder in an illegal monopoly or combination in restraint of trade.[8] They point out, moreover, that the usual recourse against such an illegal combination in the courts in this country is difficult, if not impossible, because of the absence of the plaintiff and most of the members of the Guild from the reach of the courts of this nation. There is, therefore, something to be said for the defendants' argument that this court, as a court of equity, should refuse relief to this plaintiff because the copyrights it seeks to protect are to be used in the carrying out of restraint of

---

[5] Caliga v. Inter-Ocean Newspaper Co., 1907, 7 Cir., 157 F. 186; affirmed 1909, 215 U.S. 182, 30 S.Ct. 38, 54 L.Ed. 150.

[6] Watson v. Buck, 1941, 313 U.S. 387, 404, 61 S.Ct. 962, 85 L.Ed. 1416; Interstate Circuit, etc. v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Cf. Fashion Originators Guild of America v. Federal Trade Commission, 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L.

Ed. 949; Ethyl Gasoline Corporation v. United States, 1940, 309 U.S. 436, 60 S. Ct. 618, 84 L.Ed. 852.

[7] Cf. United States v. Pacific & A. R. & Nav. Co., 1913, 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742; DeBeers Consol. Mines v. United States, 1945, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566.

[8] Buck v. Gallagher, 1940, W.D.Wash., 36 F.Supp. 405.

trade, in direct opposition to our governmental policy as expressed in the Sherman [9] and Clayton [10] Acts. Nor does the Re-Sale Price Maintenance Act [11] show a departure from that policy sufficient to protect the plaintiff here, for its agreement is not solely with the dealers who are its customers but with other producers and dealers to maintain the prices in the whole field of print sale. Refusal of the aid of the court might be thought to accord with the theory of the Morton Salt Co. v. G. S. Suppiger Co. case, 314 U.S. 488, 788, 62 S.Ct. 402, 86 L.Ed. 363, the Mercoid Corporation v. Mid-Continent Inv. Co. case, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, and others, destroying (by refusal to enjoin infringers) otherwise valid patent monopolies because of their misuse by patent holders to create in the patent holders monopoly in unpatented articles or materials. Similar destruction of copyright monopoly for its misuse in violation of the Sherman Act, as in this case, however, has been refused consistently by the courts with the sole exception of Buck v. Gallagher, supra, n. 8, the remedy under the anti-trust acts being held exclusive.[12] While we might have expected the implications of the Mercoid and other similar cases to lead to a re-examination of the refusal to apply a comparable doctrine to anti-trust act defenses in copyright cases, however, the recent refusal of the Court to allow such a defense in suit on notes [13] indicates that there will be no such re-examination. Moreover, the situations are not exactly parallel. In the patent cases, typically the legal monopoly is misused to obtain illegal monopoly over other non-patented goods. In the copyright cases the claimed illegality is the combination of holders of legal monopolies to do something in concert which they might have done sepa-

rately as to the individual copyrighted articles. They are not accused of attempting to extend the monopoly to articles not copyrighted.

■■ Aside from any defense of Sherman Act violation or lack of clean hands, it is difficult to find any abandonment of copyright by the agreement with the Guild. True, there was a voluntary limiting of the number of plates to be printed, and a minimum price at which they should be sold for a fixed period, as well as an agreement to destroy the plate after the printing of the number agreed on, or the fixed period, whichever was sooner.

But such limitations are within the power of the holder of a copyright monopoly during its term, if not made illegal because of the combination with others. The constitutional purpose of promotion of trade and the fine arts is not meant to be accomplished by unlimited dissemination of the copyrighted subject, but by giving the artist the advantages of monopoly with a free choice of methods of exploitation. Thereby it is sought to encourage other artists to produce other objects of art because of the financial gain promised by such a monopoly.

■ The defendants made the point that the mezzotints in suit are nowhere identified with those filed for copyright.

The copyright certificates are, of course, evidence that copyright issued to the plaintiff on the works described therein. We must refer to the evidence on the filing to see if those filed are identified with the mezzotints in suit. They are identified by name of work, original artist, and engraver, in the certificates. Another possible identification is in the naming of the engraver and subject in the application and certificate, if that engraver is not shown to have

---

[9] Act of July 2, 1890, c. 647, 26 Stat. 209, as amended August 17, 1937, c. 690, Title VIII, 50 Stat. 693, 15 U.S.C.A. §§ 1–7, 15 note.

[10] Act of October 15, 1914, c. 323, 38 Stat. 730, 15 U.S.C.A. §§ 12–27.

[11] Act of June 19, 1936, c. 592, 49 Stat. 1526, 15 U.S.C.A. §§ 13, 13a.

[12] Witmark & Sons v. Pastime Amusement Co., D.S.C., 1924, 298 F. 470; Geddes v. Anaconda, 1921, 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425; Wilder Mfg. Co. v. Corn Products Co., 1915, 236 U.S.

165, 35 S.Ct. 398, 59 L.Ed. 520; Paine Lumber Co. v. Neal, 1917, 244 U.S. 459, 37 S.Ct. 718, 61 L.Ed. 1256; United States v. Babcock, 1919, 250 U.S. 328, 39 S.Ct. 464, 63 L.Ed. 1011; F. A. D. Andrea v. Radio Corporation of America, D.C.Del., 1936, 14 F.Supp. 226; Buck v. Newsreel, Inc., 1938, D.C.Mass., 25 F. Supp. 787; Buck v. Cecere, 1942, W.D. N.Y., 45 F.Supp. 441.

[13] Bruce v. American Can Co., 1947, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. ——.

done at some time two of the same subject. The exhibits which were copied were signed by the engravers.

In the absence of proof to the contrary, we must find that the specimens filed with the applications are similar to, and taken from the same plates as, the mezzotints in evidence which were admittedly copied by defendants.

The plaintiff is entitled to relief, consisting of injunction against continued infringement by any of the defendants, destruction of remaining copies of lithographs and plates in the hands of defendants, damages and attorneys' fees.

■ The plaintiff has moved to strike evidence relating to the Fine Arts Trade Guild. The motion is denied. Even though the Court holds the Sherman Act defense insufficient in law, the entire Guild setup, the voluntary limitation and agreement to destroy all the plates, may be considered in arriving at probable monetary damage. The Court cannot find that the damage with reference to "de Blives" is more than nominal, since the plate was destroyed in 1931, the limited number of proofs having been taken from it and most, if not all, presumably having been sold by the plaintiff prior to the infringement.

The others had been limited as follows, and the number of proofs drawn from the plates and sold were as follows:

Under the circumstances, reference will be made to a master to determine damages, profits, and attorneys' fees, recovery to be from the three defendants jointly as joint tort-feasors, and defendant United States Printing & Lithograph Company to recover on its cross-claim against Catalda Fine Arts any portion of the plaintiff's recovery paid by it.

All motions to strike evidence, on which decision was reserved, are denied.

Defendants' motions to dismiss are denied.

Form of judgment in accordance with this memorandum may be submitted on notice.

| Edition | Title | Proofs Drawn | Sold |
|---|---|---|---|
| 400 | Picnic Party | 186 | 184 |
| 400 | Garden Party | 196 | 192 |
| 400 | La Lecon de Musique | 295 | 285 |
| 400 | Lady Rushout and Daughter | 317 | 307 |
| 300 | Pinkie | 134 | 120 |
| 400 | Chateau Renaud | 115 | 109 |
| 300 | Blue Boy | 123 | 117 |

The time limited by the Guild for production of proofs from all but "Pinkie" and "Blue Boy" had expired prior to five years before the outbreak of war in Europe. As to those two the time has now expired, although it had not in October, 1943 when the offending lithographs were delivered. There is some evidence that the Guild may have extended the time because of the war. If so, it could apply only to "Pinkie" and "Blue Boy".