**COLUMBIA BROADCASTING SYSTEM, INC., Plaintiff-Appellant,**

v.

**AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, et al., Defendants-Appellees.**

No. 24, Docket 75–7600.

United States Court of Appeals, Second Circuit.

Argued Oct. 14, 1976.

Decided Aug. 8, 1977.

Alan J. Hruska, New York City (Robert K. Baker, J. Barclay Collins, II, Robert M. Sondak, Kenneth M. Kramer, Cravath, Swaine & Moore, and John D. Appel, New York City, of counsel), for plaintiff-appellant.

Amalya L. Kearse, New York City (George A. Davidson, Pamela R. Chepiga and Hughes, Hubbard & Reed, New York City, of counsel), for defendants-appellees, Broadcast Music, Inc., et al.

Jay H. Topkis, New York City (Allan L. Blumstein, Max Gitter, Richard Reimer, Paul, Weiss, Rifkind, Wharton & Garrison, Bernard Korman, New York City, of counsel), for defendants-appellees, American Society of Composers, Authors and Publishers, et al.

Before MOORE, ANDERSON and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

The subject-matter of this appeal has been painstakingly set forth with clarity in the opinion of the District Court (Honorable Morris E. Lasker, Judge), 400 F.Supp. 737

(S.D.N.Y.1975), and we refrain from restating the details of the evidence adduced at trial. We refer to that opinion for the evidence supporting the findings.

Columbia Broadcasting System, Inc. ("CBS") is a national television network, of which there are two others, National Broadcasting Company ("NBC") and American Broadcasting Company ("ABC"). CBS has brought this antitrust action against the American Society of Composers, Authors and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI"), and their members and affiliates.[1] These members and affiliates are writers and publishers of musical compositions.[2] ASCAP and BMI license the non-dramatic performance rights in their compositions.[3]

ASCAP and BMI issue blanket licenses for the right to perform any or all of the compositions in their repertories over the CBS network in exchange for a *negotiated* fixed annual fee. CBS contends that this method of licensing violates §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and constitutes copyright misuse.[4] CBS sought an injunction under § 16 of the Clayton Act, 15 U.S.C. § 26, directing ASCAP and BMI to offer CBS performing rights licenses on terms which reflect the actual use of music by CBS, or, alternatively, enjoining them from offering blanket licenses to any television network. CBS also sought a declaration of copyright misuse under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. The District Court, after a trial without a jury on liability alone, dismissed the complaint, and CBS appeals.

In dealing with performing rights in the music industry we confront conditions both in copyright law and in antitrust law which are *sui generis*. Analogy may be sought in each field, but the practical complexities of licensing musical non-dramatic performing rights can find no precise analogy anywhere. In the case of ordinary products, persons who use them without paying for them are generally thieves. In the case of infringement of performing rights in musical compositions, the infringement can be wholly innocent or due to the pressure and difficulty of obtaining timely clearance by individual license. This infringement aspect, unknown elsewhere, except to some extent in the field of patents, makes the music industry *sui generis*.

## I

A summary history of ASCAP's difficulties with the antitrust laws will enable us to focus on the limited but difficult questions presented on this appeal.

---

1. The references hereafter to ASCAP or appellant shall be taken to include BMI, unless the context clearly indicates otherwise. CBS was one of the founders of BMI in 1939. It gave up its stock interest in BMI in 1959, as have the other two networks. BMI in still owned by individual broadcasters. CBS is the parent of CTN, the Columbia Television Network.

2. "Writers" is a generic term which describes both those who supply the music, the composers, and those who supply the lyrics, the authors. *See Schwartz v. Broadcast Music, Inc.*, 180 F.Supp. 322, 326 n.5 (S.D.N.Y.1959).

3. These non-dramatic rights are called the "small" rights of musical compositions as opposed to the "grand" or dramatic rights. For a discussion of the distinction between these terms, *see* 2 *Nimmer on Copyright* § 125.6 (1976). *For our purposes it is enough to note that while ASCAP could normally license the performance of a song from, for example,* My Fair Lady, *it could not license the song in the context of a performance in whole or part of*

*the play itself. Apparently, most uses of a musical composition by broadcasters, nightclubs and restaurants would be considered non-dramatic and therefore subject to license by ASCAP. Throughout this opinion references to "performing rights" refer only to performing rights for profit in non-dramatic performances.*

4. Sections 1 and 2 of the Sherman Act state in relevant part:

"§ 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

"§ 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ."

In 1934 the Department of Justice filed suit against ASCAP seeking its dissolution and charging, *inter alia*, that through its pooling of individual copyrights ASCAP had the power to, and did, dominate the radio broadcasting industry.[5] However, after two weeks of trial, the Government received a continuance and the case remained dormant thereafter.

In 1941 the Government sued ASCAP and BMI as unlawful combinations on the principal ground that the annual blanket license (which was the *only* license then offered by ASCAP and BMI) was in restraint of trade. The complaint also charged that arbitrary prices were being obtained for the blanket licenses by the illegal pooling of copyrights. The Government sought an order enjoining, *inter alia*, ASCAP's *exclusive* licensing and requiring a form of *per use* licensing.

A consent decree resulted in 1941 by the terms of which ASCAP could no longer assert the *exclusive* right to license performing rights and could no longer interfere with *individual* licensing by its members. But the latter provision was itself illusory, because if the member licensed performing rights in his own copyright, he nevertheless had to pay the royalties derived therefrom into the ASCAP pot, thus affording little incentive for licensing by the individual member.[6]

Soon after the 1941 consent decree, ASCAP was sued by two hundred motion picture theatre owners for violation of Sections 1 and 2 of the Sherman Act. The problem was special to the theatre exhibition industry which was required at that time to take an ASCAP blanket performance license in order to exhibit motion pictures, the synchronized music of which had *already* been licensed to the motion picture producer. The specific holding by Judge Leibell in *Alden-Rochelle, Inc. v. ASCAP*, 80 F.Supp. 888 (S.D.N.Y.1948), was that it was unlawful for ASCAP to require the motion picture producer to contract with distributors that the film would be shown only in theatres having an ASCAP *performance* license. In broader terms, the decision held that ASCAP was a combination in restraint of trade because the members had transferred all their non-dramatic performing rights to ASCAP and were barred from individually assigning such rights to motion picture producers. 80 F.Supp. at 894. *See also M. Witmark & Sons v. Jensen*, 80 F.Supp. 843, 849 (D.Minn.1948).[7]

At about this time, the Government began to renegotiate the consent decree with ASCAP. The amended consent decree reflected two important changes. First, ASCAP, unlike its position under the 1941 decree, was no longer permitted to interfere with the right of any of its members to issue a direct license to a user. The royalty so obtained did not have to go into the ASCAP pot for later distribution on some formula basis. Second, although ASCAP was still not required to issue per use licenses for broadcasters, it was required to issue per program licenses and not to discriminate against their free selection by licensees.[8]

The per program license is simply another form of blanket license. Both it and the "annual" blanket license permit use of any composition in the ASCAP inventory, and both permit payment by a fixed percentage of advertising revenues or a "flat" fee. The difference is that under the annual blanket license, the payment remains the same for the year regardless of whether all

---

**5.** *United States v. ASCAP*, Equity No. 78–388 (S.D.N.Y., filed Aug. 30, 1934). *See* Note, "Musical Monopolies and Legislative Control," 53 Harv.L.Rev. 458, 459 (1940); Note, "Anti-ASCAP Legislation and Its Judicial Interpretation, 9 Geo.Wash.L.Rev. 713, 720 (1941).

**6.** *See* Section II(I) of the 1941 Decree, *United States v. ASCAP*, 1940–43 CCH Trade Cases ¶ 56,104 at 403 (S.D.N.Y.1941); Timberg, "The Antitrust Aspects of Merchandising Modern Music: The ASCAP Consent Judgment of 1950," 19 Law & Contemp.Prob. 294, 320 (1954).

**7.** The *Alden-Rochelle* decision, *supra*, dealt only with performing rights in motion picture theatres.

**8.** *See United States v. ASCAP*, 1950–51 CCH Trade Cases ¶ 62,595 at 63,753–754 (S.D.N.Y. 1950).

or none of the network's programs use ASCAP compositions, while under the per program license the fee is determined by the number of programs using ASCAP compositions. However, neither permits the licensee to pay only for those compositions which it actually uses, and the per program license should not be confused with a per use license.[9]

In strengthening the per program alternative, the amended decree prohibits ASCAP from requiring or influencing the licensee to negotiate for an annual blanket license before negotiating for a per program blanket license, and prohibits discrimination against its use by price differentials. If the licensee and ASCAP cannot agree upon a fee, the matter is left to the District Court to determine a "reasonable fee." And a prospective licensee is theoretically free to negotiate for non-exclusive performance rights with any ASCAP member, without interference by ASCAP. But ASCAP is presently not free to negotiate for licenses for the performance of particular music without the specific consent of the ASCAP member.

Though CBS acquiesced in this arrangement for many years, it decided, some years ago, that it was being denied the right to pay only for the music it uses. It could not, by itself, attempt to amend the decree. Instead, it brought this action, as it was entitled to do.[10] In the meantime, NBC and ABC, while they may have other grievances, have not joined in this attack on blanket licensing to the networks.[11]

## II

CBS contends that the blanket licensing method is not only an illegal tie-in or block-booking which in practical terms is coercive in effect, but is also an illegal price-fixing device, a per se violation of Sherman Act § 1 in restraint of trade.

Judge Lasker, treating the case essentially as a tie-in or block-booking case which required proof of coercion to establish illegality, held that the provision of the consent decree allowing direct licensing for use by the individual copyright owners saved the scheme from being coercive and, hence, illegal. He found that the right of CBS to negotiate with individual copyright owners was not impractical, even if the blanket licensing system were not enjoined, but rather that the evidence indicated that if CBS chose to do so, it could obtain the performing rights it needed for use in a direct negotiation market without having to take a blanket license from ASCAP.[12] On

---

**9.** Under the per program license, once there is any use, the amount of use is irrelevant. It does not matter whether one bar or twenty full compositions are performed in each program, the fee remains the same.

The utility of the per program license appears to be limited to broadcasters whose schedule consists predominantly of non-musical programming. In any case, we understand that all three networks and virtually all commercial television stations in the United States hold "annual" blanket licenses.

Under a per use license, on the contrary, the user would pay only for those compositions actually used during the program.

**10.** *See Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 689–90, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961); *United States v. ASCAP (Shenandoah Valley Broadcasting, Inc.)*, 331 F.2d 117, 124 (2d Cir.), *cert. denied*, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964).

**11.** We note, however, that both ABC and NBC have specifically retained the right to transfer to a per use license from a blanket license, but only in the event that CBS receives a per use license from ASCAP.

**12.** Judge Lasker had the benefit of the expert testimony of three distinguished economists, Franklin M. Fisher for CBS, Robert Nathan for ASCAP and Peter O. Steiner for BMI. The experts disagreed sharply on the likely future action of a direct negotiation market. Judge Lasker essentially accepted the Nathan view. He found that the market forces would tend to create a licensing agency similar to the Harry Fox Agency which handles synchronization rights. There was testimony that it would take probably six months to a year after CBS' announcement of its intention to go to direct licensing for a viable market to emerge and that, in the meantime, there would be some disinclination to deal with CBS with some attendant confusion. Mr. Nathan frankly conceded, however, that there is no actual evidence of the characteristics of a direct negotiation market in these circumstances, for it has never been tried.

that basis, as well as on his conclusion that there was no unlawful price-fixing, he dismissed the complaint.

Without commenting in detail on the evidence contained in the twenty-four volumes of the Appendix, we note that there was conflicting testimony by witnesses from the music industry and by expert economists on each side. We recognize that not all network needs for music would encounter the same difficulty in procurement. Thus, theme or background music is often original music created by a composer on a salary basis for a packager of the program or for the network. In such case, individual negotiation for the performing rights would not be difficult. Where the theme or background music has already been published, the name of the publisher is easily available. In the case of "feature" performances on variety shows, the obtaining of performance rights does involve some uncertainty. Situations may indeed arise where the writer's consent is required and would be hard to get. However, even in this area CBS could require the outside packager or producer to obtain the performance rights when he obtains the synchronization rights.[13]

The conflicting predictions at the trial obviously involved psychological as well as economic factors, and the economic theory presented was an amalgam of the two. Prophesying the future is one of the less satisfactory tools of the judicial process. Suffice it to say that our review leads us to the conclusion that the essential finding of the District Court that such a market *can* exist is not clearly erroneous.[14]

While this finding of the District Court that there is indeed a viable alternative to the blanket license disposes of the charge that the blanket license involves an illegal tie-in or block-booking, *see, e. g., United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 159, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); 17 U.Chi.L.Rev. 183 (1949); Timberg, *supra* note 6 at 300, it does not resolve the charge of restraint of trade by the fixing of prices.

The charge that there is a restraint of trade by price-fixing is founded upon the

---

**13.** The writer generally assigns the right to license performing rights to the music publishers. Under the American Guild of Authors and Composers form contract, publishers are required to obtain an AGAC writer's consent for television synchronization licenses for songs over ten years old, and motion picture synchronization licenses for vocal use of a composition. The District Court, based on the testimony, found that "[t]here is every reason to believe that most writers would either give their publishers blanket consent for performance licenses, or give it promptly on a use-by-use basis, just as they presently do regarding synch rights." 400 F.Supp. at 761. The upshot is that, as a practical matter, the networks would generally deal with publishers or through brokers or agencies of the publishers, rather than composers. *See* 400 F.Supp. 760–62.

**14.** CBS also calls attention to one historical situation and to one current situation in support of its thesis that a direct negotiation market will not work. It contends that when Minnesota Mining and Manufacturing Company tried to negotiate individual licenses for performing rights on an experimental background music project, it allegedly met with frustration. The District Court found, however, that CBS' allegations concerning that situation were overstated and, in any case, did not support CBS' contentions here, 400 F.Supp. at 771–75. Its finding is not clearly erroneous.

CBS also raises a subsidiary problem dealing with "music in the can." Each network now has a large inventory of recorded programs and motion picture films containing music for which it has synchronization rights but no performing rights other than those afforded by the ASCAP blanket license. CBS contends that since it lacks performing rights the copyright proprietor would have an enormous leverage to exact a premium, because, in the absence of a blanket license, appellant could not telecast the motion picture without the music owner's consent. There is a good deal of speculation in the record on what would happen to the amount of royalty for "music in the can" in various hypothetical situations, including testimony that CBS is so powerful a buyer that publishers could not afford to get into its bad graces. This is a question of fact and the District Court found that "CBS has not proven that its fears of a 'holdup' by copyright proprietors are justified." 400 F.Supp. at 776. In any event, it is hard to see how "music in the can" problems will be solved by an injunction against blanket licensing. The individual licenses would still have to be negotiated with some of the same economic problems involved.

conception that when any group of sellers or licensors continues to sell their products through a single agency with a single price, competition on price by the individual sellers has been restrained. When the single price includes compensation even for those in the combination whose wares are not used, it may be said that the single price has been increased to take care of such compensatory factors which are irrelevant to true competition. But even if the single price is *reasonable*, the determination of how much each copyright owner gets from the common pot is an artificial fixing of the price to that member of the combination for his composition.[15] His distributive share of the common royalties may be greater than the royalty he would receive in a free market. In such case, even if the members of the combination are willing not only to join in the blanket license, but also to sell their individual performing rights separately, the combination is nevertheless a "combination which tampers with price structures [and therefore] engage[s] in an unlawful activity." *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940).[16]

There is no doubt that when ASCAP issues a blanket license, the royalty received by the individual writer or publisher is the result of at least the threshold elimination of price competition for the performing rights in his own particular composition, and Judge Lasker found that musical com-

positions, though not fungible, do fall into classes, so that one composition in a particular class may serve the network as well as another in the same class. 400 F.Supp. at 751–52. There is, moreover, some analogy to the patent pooling cases which broadly hold that the pooling of competing, and perhaps even non-competing, patents is illegal. *See United States v. New Wrinkle, Inc.,* 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417 (1952); *United States v. Line Material Co.,* 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701 (1948).[17] While these cases involved resale price-maintenance agreements, the broad language of the opinions treated the patent pooling agreement as itself unlawful.[18]

Price-fixing, as we have been instructed, is generally unlawful per se. *United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at 221, 223, 60 S.Ct. 811; *United States v. Trenton Potteries Co.,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). Yet it may be that in some circumstances market requirements would require the acceptance of some form of price-fixing. In fact, both the plaintiff here, CBS, and the Department of Justice, which is charged with enforcing the Sherman Act, recognize in the case of ASCAP blanket licenses what CBS has termed the "Per Se Rule with a Market-Functioning Exception". In short this concept holds that price-fixing is per se illegal except where it is absolutely necessary for the market to function at all.

---

**15.** ASCAP distributes about $1,000 ($400–$500 to the publisher or publishers; $400–$500 to the writer or writers) for each television network feature performance of an ASCAP composition (and correspondingly lower amounts for theme and background uses). The royalty is fixed by ASCAP and not by the licensee.

Paragraph XI of the 1950 amended decree requires ASCAP to distribute royalties on "a basis which gives primary consideration to the performance of the compositions . . .." Under the 1960 amendment, writers also have the option of receiving royalties under a plan which compensates them additionally for length of membership and the recognized status of their works. *See* 1960 Consent Decree, Section III(A) and Part I of Attachment A, *United States v. ASCAP,* 1960 CCH Trade Cases ¶ 69,612 at 76,469–470 (S.D.N.Y.1960).

**16.** And, of course, it has long been held that the fact that "the object of sale is the creation or

product of a man's ingenuity does not alter this principle." *Associated Press v. United States,* 326 U.S. 1, 15, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013 (1945). *See Fashion Originators' Guild v. Federal Trade Commission,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

**17.** Hence, on the surface, the pool of copyrights may be analogized to a pool of competing patents.

**18.** *See United States v. New Wrinkle, Inc.,* 342 U.S. 371, 377, 380, 72 S.Ct. 350, 96 L.Ed. 417 (1952); *United States v. Line Material Co.,* 333 U.S. 287, 308, 68 S.Ct. 550, 561, 92 L.Ed. 701 (1948) (illegal "whether it is a price agreement between *producers for sale* or between producer and distributor for resale") (emphasis added).

The question was addressed by the Government in the case of *K–91, Inc. v. Gershwin Publishing Corp.*, 372 F.2d 1 (9th Cir. 1967), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968). That was an action for copyright infringement brought by several ASCAP members against a radio broadcaster operating in the state of Washington. The broadcaster defended in part on the assertion that ASCAP's price-fixing as well as its commission of other antitrust violations constituted copyright misuse. It also counterclaimed for treble damages and injunctive relief. The District Court held that the copyrights were infringed and that the defense and counterclaims were insufficient. The Ninth Circuit, in affirming, rejected the antitrust defense.

In *K–91* the parties recognized that there was a market need for blanket licensing for the single radio station there involved; indeed, they had stipulated that "[i]t would be commercially, practicably and virtually impossible for defendant and almost all other broadcasters to acquire a separate license for each performance broadcast over commercial stations." [19]

On the petition for certiorari in an amicus brief, the Solicitor General, in approving the result reached by the Ninth Circuit, stated:

> "The Sherman Act has always been discriminatingly applied in the light of economic realities. There are situations in which competitors have been permitted to form joint selling agencies or other pooled activities, subject to strict limitations under the antitrust laws to guarantee against abuse of the collective power thus created. *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *United States v. St. Louis Terminal*, 224 U.S. 383, 32 S.Ct. 507, 56

L.Ed. 810 (1912); *Appalachian Coals, Inc. v. United States*, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933); *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). This case appears to us to involve such a situation. The extraordinary number of users spread across the land, the ease with which a performance may be broadcast, the sheer volume of copyrighted compositions, the enormous quantity of separate performances each year, the impracticability of negotiating individual licenses for each composition, and the ephemeral nature of each performance all combine to create unique market conditions for performance rights to recorded music.

> "If this market is to function at all, there must be—at least with respect to licensing the performance of recorded music—some kind of central licensing agency by which copyright holders may offer their works in a common pool to all who wish to use them." [20]

The Solicitor General recognized that for some broadcasters direct licensing might be possible and more desirable, and that technological changes, such as in computer technology, might eliminate the need for the blanket license. He found, however, that market necessity may justify "bulk licensing of recorded music" where no "practical alternatives exist" [21] and concluded that on the record in that radio-broadcasting case the ASCAP blanket license to the radio station did not violate the antitrust laws.

This "market necessity" concept, as a very limited and narrow exception to the per se rule against price-fixing, is not without merit. It would seem reasonable to conclude that Section 1 of the Sherman Act, which prohibits combinations in restraint of trade, should be construed so as not to prohibit the very trade it was intended to

---

**19.** The stipulation is quoted in Judge Lasker's opinion below on ASCAP's motion for summary judgment. *Columbia Broadcasting System, Inc. v. ASCAP*, 337 F.Supp. 394, 400 (S.D.N.Y. 1972).

**20.** Memorandum of the United States as Amicus Curiae on Petition for Writ of Certiorari in

the Supreme Court of the United States, *K–91, Inc. v. Gershwin Publishing Corp.*, No. 147, dated December, 1967 at 10–11 ("Amicus Brief").

**21.** *Id.* at 13.

protect.[22] We do not quarrel, therefore, with the *result* reached by the Ninth Circuit in *K–91.*

In this case, by contrast, Judge Lasker found that, with respect to the television networks, a "practical alternative"—the free direct negotiation market—can exist *even beside* the blanket license. It would seem to follow *a fortiori* that the direct negotiating market can surely exist if the blanket license is eliminated.

The dilemma here is that if the blanket licensing system is viewed as block-booking, the *availability* of a direct negotiating market does save it from being "coercive." On the other hand, if the blanket licensing system is held to be price-fixing in restraint of trade, the very availability of a direct negotiating market would tend to make the blanket license less of a "market necessity." Curiously, though appellant now focuses its principal attack on the blanket license as a price-fixing device, it was appellant which throughout the trial tendered proof upon proof that a direct negotiating market posed *severe* practical problems. If that is true, such proof tends to demonstrate a *need* for the availability of an alternative blanket license. On the other hand, it was ASCAP which attempted to prove that a direct negotiating market can be made to exist even in competition with the blanket license. This raises the question, paradoxically, whether if that be true, the blanket license can nonetheless continue to be regarded as a market *necessity.* Thus, if we pose the issue as tie-in or block-booking, the absence of coercion supports the view of the District Court if we accept its finding that a direct negotiating market is feasible. On the other hand, if we pose the issue as restraint of trade through price-fixing, the

very finding that a direct negotiating market is feasible tends to undermine the need for the blanket license as a market *necessity.*

■ Several arguments have been advanced to refute the contention that the blanket license is itself a price-fixing mechanism in restraint of trade. The District Court met the price-fixing argument by suggesting that price-fixing has been sustained in patent cases in the absence of coercion. It cited *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), and *Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), for the proposition that "the critical difference between an illegal licensing arrangement and a legal one is the fact of coercion or compulsion by the licensor." 400 F.Supp. at 749. The *Hazeltine* cases did not involve a restraint of trade by price-fixing, however, for these were cases in which a single trader, Hazeltine, owned and licensed all the patents involved. Coercion is simply not an essential ingredient of price-fixing. *Cf. United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at 225 n.59, 60 S.Ct. 811.

■ Another price-fixing defense asserted by ASCAP and accepted by the Ninth Circuit in *K–91* is that the consent decree insulated ASCAP against the restraint of trade charge on the ground that the price of the blanket license was "reasonable," since resort to the District Court was available to determine "reasonableness." That a price fixed by the agreement of competitors is "reasonable" is not a defense, however.[23] Nor do we think that the determination of the "reasonableness" of

---

**22.** The narrowness of the exception is emphasized by the circumstance that it is difficult even to imagine another industry where such a "market necessity" defense would be applicable.

**23.** *Cf. United States v. Trenton Potteries Co.,* 273 U.S. 392, 396–97, 47 S.Ct. 377, 71 L.Ed. 700 (1927). We also note that the costs of litigating the issue of what is a "reasonable" fee in the Southern District of New York would dis-

courage some users from taking advantage of this provision in the decree. In fact, in the 27-year existence of the provision, the consent-decree judge has never had to fix a "reasonable" fee for an ASCAP blanket license.

Finally, we note that this defense would not be available to BMI because its consent decree has no provision providing recourse to the District Court to determine a "reasonable" fee in cases of disagreement between the parties.

the price by a *court* saves the price that has been fixed by a combination from continuing to be an unlawful device in restraint of trade, absent the justification of market necessity. In the *K–91* situation, the resort to judicial supervision was adequate for the simple reason that there was no other solution possible. The provision in the consent decree for resort to the District Court if there is a dispute on the reasonableness of the blanket license fee was highly desirable in the *K–91* situation, because there it represented a threatening veto to gross overreaching. On the other hand, when a competitive market *is* available, as the District Court found to be the case here, the determination of price by a judge can hardly be the equivalent of a price determined by a competitive market. For a price fixed by a judge, no matter what his personal competence, is not a true reflection of competitive market forces. The price, no matter how reasonable, if determined on the imprimatur of a court, remains the product of noncompetitive forces.

■ Nor is ASCAP "disinfected" by the Government consent decree, see *K–91, supra* at 4; such a decree does not "constitut[e] an implied partial repeal of the antitrust laws." 337 F.Supp. at 399–400. A consent decree has no such potency. Nonparties who did not participate in the settlement, and who are affected by ASCAP's activities may challenge them under the antitrust laws. *See Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 689–90, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961); *United States v. ASCAP (Shenandoah Valley Broadcasting, Inc.)*, 331 F.2d 117, 124 (2d Cir.), *cert. denied*, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964).

As the Supreme Court has noted, subsequent to the *K–91* decision, a consent decree, as it affects the parties themselves, is simply a compromise based on many fac-

tors. *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). In historical fact, the government lawyer who negotiated the 1950 decree has stated that the "District Judge who entered the judgment, in conformity with the prevailing practice, gave no indication as to the legality or illegality of ASCAP's past organization or contemplated reorganization, or of its old or new practices." *Timberg, supra* note 6, at 295 n.2. And more recently, as the Solicitor General noted in his amicus brief in *K–91*: "[p]rivate parties, of course, always have the option of seeking relief in their own behalf, notwithstanding any consent decree accepted by the government."[24] The Government consent decree does not insulate ASCAP from the claims of private plaintiffs.[25]

Finally, ASCAP argues, as its basic premise, that the blanket license of the performance rights in *all* the copyrights in the Society's basket is so different from the performing right in each separate copyright that the claim of trade restraint by price-fixing is precluded. It urges that the collective activity necessary for the blanket license does not amount to price-fixing of the individual performing rights since the network can still bargain for such individual performing rights with each copyright owner separately. The argument that if one does not want the blanket license he need not take it is plausible. Yet the very availability of the blanket license itself involves the fixing of a collective price, which must, inevitably, permit the individual copyright owner to *choose* the blanket license as his medium of licensing in preference to individual bargaining. The blanket license dulls his incentive to compete. "[T]he fact that an agreement to restrain trade does not inhibit competition in all of the objects of that trade cannot save it from the condemnation of the Sherman Act." *See Associated Press v. United*

---

24. *See* Amicus Brief, *supra* note 20 at 14.

25. We do not imply that a government consent decree should be given no weight at all, especially since the Department of Justice has the responsibility for enforcing the Sherman Act. But it is not even clear that the problems presented in this action are coeval with those which surfaced almost 30 years ago when this decree was negotiated. We have had a more recent indication of the government's views, moreover, in its amicus brief in *K–91*.

*States*, 326 U.S. 1, 17, 65 S.Ct. 1416, 1423, 89 L.Ed. 2013 (1945).

ASCAP analogizes a blanket license to a symphony orchestra, in which the ensemble is different from the individual musicians and which may therefore lawfully command a price which is different and higher than the price for each musician's performance. The fallacy is that when the orchestra plays as an ensemble it represents the only product of its kind. Here each composer, by contrast, records his own solo for separate broadcast. The musicians in an orchestra are not competitors; the contributors of copyrights for the blanket license in many situations are, and it is their price competition among themselves that is affected by the blanket license.

■ We therefore conclude that the ASCAP blanket license in its present form is *price-fixing and with respect to the television networks cannot be saved by a "market necessity" defense.* It therefore constitutes a violation of § 1 of the Sherman Act. We accordingly reverse the District Court's dismissal of the complaint.[26]

### III

The trial below was on liability alone, and in view of the dismissal of the complaint no separate evidence was taken on remedy. In reversing the dismissal of the complaint we do not fashion the remedy. We think it useful, however, to offer some guidelines to the District Court in its selection of remedies.

■ Normally, after a finding of price-fixing, the remedy is an injunction against the price-fixing—in this case, the blanket license. We think, however, that if on remand a remedy can be fashioned which will ensure that the blanket license will not affect the price or negotiations for direct licenses, the blanket license need not be prohibited in all circumstances.[27] The blanket license is not simply a "naked restraint" ineluctably doomed to extinction. There is not enough evidence in the present record to compel a finding that the blanket license does not serve a market need for those who wish full protection against infringement suits or who, for some other business reason, deem the blanket license desirable. The blanket license includes a practical covenant not to sue for infringement of any ASCAP copyright as well as an indemnification against suits by others.

Our objection to the blanket license is that it reduces price competition among the members and provides a disinclination to compete. We think that these objections may be removed if ASCAP itself is required to provide some form of per use licensing which will ensure competition among the individual members with respect to those networks which wish to engage in per use licensing.[28]

**26.** In not reaching the same result as the Ninth Circuit did in *K–91*, we, in no way, intimate that we would have held the blanket license to the single radio station to be unlawful, or that the blanket licenses given by ASCAP generally are unlawful. The *K–91* result was, in our view, entirely justifiable as an example of market necessity. Indeed, CBS concedes that market necessity would probably justify ASCAP blanket licenses for restaurants, night clubs, skating rinks and even radio stations.

**27.** We recognize that CBS contends that a blanket licensing system overhanging the market in any combination of circumstances will necessarily affect the price for each set of individual performing rights. On this record we are not convinced that this is necessarily so. And the District Court found the contrary.

CBS has asserted that an individual member of ASCAP, thrown into a direct negotiating market for the first time, will tend to measure the royalty he asks for a particular performing right by the royalty he has actually been receiving from ASCAP as his share under the blanket license. Considering the counterforce of the strong bargaining power of CBS, we cannot accept this as more than a theoretical assumption. Until some alternative method has actually been allowed to function for some time, contemporaneously with the blanket license, no man can say for certain that CBS' fears will prove inevitably to be true.

**28.** On remand, we think it would be appropriate for the District Court to invite the Department of Justice to participate or express its view on the appropriate remedy.

We also emphasize that in the foregoing discussion of remedy, "ASCAP" also includes appellant BMI. *See* note 1, *supra.*

We reverse the judgment dismissing the complaint and remand to the District Court for further proceedings in accordance herewith.[29] If the District Court considers it appropriate, it may fashion interim relief as well. No costs.

MOORE, Circuit Judge (concurring):

I concur in the majority's conclusion to remand for further proceedings so that such proof and argument as may be required, may be presented as will enable the court, and hopefully the parties as well, to evolve a practical method of adding to ASCAP's repertory per use licensing. Since future proceedings will be directed to that issue, my points of disagreement will not even rise to the status of that legal vacuity known as "dicta". However, I do not agree that "the ASCAP blanket license in its present form is price-fixing and with respect to the television networks cannot be saved by a 'market necessity' defense."

Market necessity is recognized by the majority as "not without merit" and certainly *K–91, Inc. v. Gershwin Publishing Corp.*, 372 F.2d 1 (9th Cir. 1967), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968), and the Solicitor General's accompanying amicus brief would support this view.

**29.** As noted, CBS also claims violation of § 2 of the Sherman Act. We need not go into the legal arguments on this point because they are grounded on its factual claim that there are barriers to direct licensing and "bypass" of the ASCAP blanket license. The District Court, as noted, rejected this contention and its findings are not clearly erroneous. The § 2 claim must therefore fail at this time and on this record.

We dispose of CBS' claim of copyright misuse in the same manner and for essentially the same reasons as the § 1 claim.