

# The Attorney General of Texas

October 31, 1978

JOHN L. HILL
Attorney General

Supreme Court Building
P.O. Box 12548
Austin, TX. 78711
512/475-2501

701 Commerce, Suite 200
Dallas, TX. 75202
214/742-8944

4624 Alberta Ave., Suite 160
El Paso, TX. 79905
915/533-3484

723 Main, Suite 610
Houston, TX. 77002
713/228-0701

806 Broadway, Suite 312
Lubbock, TX. 79401
806/747-5238

4313 N. Tenth, Suite F
McAllen, TX. 78501
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205
512/225-4191

An Equal Opportunity
Affirmative Action Employer

Honorable Lloyd D. Vincent
President
Angelo State University
San Angelo, Texas 76901

Opinion No. H-1260

Re: Application of Copyright Revision Act of 1976 to performances of musical works at state colleges and universities.

Dear President Vincent:

You inquire about the application of federal copyright law to musical performances at state colleges and universities. The Copyright Revision Act of 1976, 17 U.S.C. SS 101-810, gives a copyright owner the exclusive right to authorize the public performance of his musical works, subject to the Fair Use Doctrine and certain specific exceptions. 17 U.S.C. SS 106(4); 107; 110. Other persons who wish to perform copyrighted music publicly must secure the copyright holder's permission, usually by paying him a licensing fee. See 17 U.S.C. S 501(a).

Many copyright owners have authorized private performing rights organizations, the American Society of Composers, Authors, and Publishing (ASCAP) and Broadcast Music, Inc. (BMI), to license their works. These organizations have asked state supported colleges and universities to sign blanket licensing agreements, which require the payment of a yearly fee in exchange for the right to perform any composition in the society's repertory. The fee is based on the institution's enrollment and the number of major concerts it holds each year.

You first ask whether state supported colleges and universities must secure permission for the performance of copyrighted works on campus. Although prior law required a license only when a performance was "for profit," Act of July 30, 1947, ch. 391, S 104, 61 Stat. 652; see also Annot., 23 A.L.R. Fed. 974 (1975), the new law also requires licensing for nonprofit performances, with certain specific exceptions. The following provisions are most relevant to your questions:

> Notwithstanding the provisions of section 106 [17 U.S.C. S 106], the following are not infringements of copyright:
> (1) performance or display of a work by instructors or pupils in the course of face-to-face teaching

activities of a nonprofit educational institution, in a class-room or similar place devoted to instruction. . .;

. . . .

(4)  performance of a nondramatic literary or musical work otherwise than in a transmission to the public, without any purpose of direct or indirect commercial advantage and without payment of any fee or other compensation for the performance to any of its performers, promoters, or organizers, if —
    (A)  there is no direct or indirect admission charge; or
    (B)  the proceeds, after deducting the reasonable costs of producing the performance, are used exclusively for educational, religious, or charitable purposes and not for private financial gain, except where the copyright owner has served notice of objection to the performance under the following conditions;
        (i)  the notice shall be in writing and signed by the copyright owner or such owner's duly authorized agent; and
        (ii)  the notice shall be served on the person responsible for the performance at least seven days before the date of the performance, and shall state the reasons for the objection; and
        (iii) the notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation;

17 U.S.C. § 110.  Section 110(2) exempts the performance of musical works in certain instructional broadcasts.

In our opinion, these provisions do not exempt all uses of copyrighted music which customarily occur at state colleges and universities.  Section 110(1) excepts the performance of a work in the course of face-to-face teaching activities.  The exempted teaching activities do not include performances given for the entertainment of any part of the audience.  H. R. Rep. No. 1476, 94th Cong., 2d Sess. 81 (1976) reprinted in [1976] U.S. Code Cong. & Ad News 5659, 5695 [hereinafter cited as H. R. Rep. No. 1476].

Section 110(4) states the conditions under which an institution may hold noninstructional public performances without securing permission to use copyrighted works.  There are two threshhold conditions.  The performance must be (1) without the purpose of direct or indirect commercial advantage and (2) without payment of a fee or compensation to any performer, promoter, or organizer.  The

first condition requires that the performance be nonprofit; a free performance sponsored in connection with a profit-making enterprise is "for profit." H. R. Rep. No. 1476 at 85; see Herbert v. Stanley Co., 242 U.S. 591 (1917) (performance of music in restaurant to entertain guests was public performance). The second condition is designed to prevent the free use of copyrighted material where fees or percentages are paid to performers, promoters, and producers. H. R. Rep. No. 1476 at 85. However, it does not prevent the free use of copyrighted material where the performers and organizers receive a salary for duties encompassing the performance instead of being paid directly for the performance. A legislative report gives as an example a school orchestra performance directed by a music teacher who receives an annual salary. Id. In the case of colleges and universities, musical performances in which salaried employees participate as organizers, directors or performers would fit the second condition. However, if an outside performer receives a fee for an appearance, the second condition would be violated, and permission for his use of copyrighted material would have to be secured.

Once the threshhold conditions in section 110(4) are satisfied, one of two additional standards must also be met. Either there must be no direct or indirect admission charge, or the proceeds must be "used exclusively for educational, religious, or charitable purposes and not for private financial gain." Thus, a university could charge admission for a concert by the student orchestra, but would not have to seek permission to use copyrighted music if the proceeds were used for bona fide educational purposes. H. R. Rep. No. 1476 at 86. Section 110(4)(B) empowers the copyright owner to stop a performance for which admission is charged by serving notice on the person responsible for it at least seven days in advance. The burden is on the copyright owner to object in accordance with procedures established by federal regulations. See 42 Fed. Reg. 64, 684 (1977) (to be codified as 37 C.F.R. § 201.13(c)); 17 U.S.C.A. (Supp. 1978). Whether the proceeds of concert admission fees are used for educational purposes must be determined on the facts of each case.

You suggest that article 3, section 51 of the Texas Constitution, which forbids the gift of public funds, would prevent you from signing blanket license agreements. We believe you may pay license fees, consistently with article 3, section 51, for performances not within the exceptions of section 110, such as a performance by an outside person who receives a fee for his appearance. In addition, when a copyright holder objects to a proposed performance pursuant to section 110(4)(B), payment of licensing fees will undoubtedly be necessary to secure the withdrawal of his objection. Under these circumstances, the licensing fees would generally constitute a reasonable expense of authorized university activities.

Whether or not an institution may also enter into a particular licensing agreement depends upon all the relevant facts. Article 3, section 51 requires that the college or university receive adequate consideration for its payment of license fees. See Dodson v. Marshall, 118 S.W.2d 621 (Tex. Civ. App. — Waco 1938, writ dism'd); Attorney General Opinions H-520 (1974); H-403 (1974). The adequacy of consideration received for licensing fees depends on such factors as the extent to

which the school will use music covered by the license in nonexempt performances, the administrative convenience afforded by the blanket licensing scheme, and the costs of securing permission for performances through alternative means. This determination is for college and university authorities.

You also ask whether these agreements violate federal anti-trust laws. Combinations to restrain competition or fix prices in performing rights can violate federal anti-trust laws. Alden-Rochelle, Inc. v. American Society of Composers, Authors and Publishers, 80 F. Supp. 888 (S.D.N.Y. 1948); Alfred Bell & Co., Ltd, v. Catalda Fine Arts, Inc., 74 F. Supp. 973 (S.D.N.Y. 1947). ASCAP has been the defendant in anti-trust suits brought by the Department of Justice and is operating under a 1950 consent decree entered in the District Court for the Southern District of New York. Columbia Broadcasting System, Inc. v. American Society of Composers, Authors, and Publishers, 562 F.2d 130 (2d Cir. 1977), cert. granted, 47 U.S.L.W. 3187 (U.S. Oct. 3, 1978) (Nos. 77-1578, 77-1583), [hereinafter CBS v. ASCAP]. Although the consent decree authorizes the district court to set a reasonable licensing fee when a licensee and ASCAP cannot agree, private plaintiffs are not restricted to this method of pressing claims against ASCAP. Id. at 134, 139.

The Columbia Broadcasting System recently sued ASCAP and BMI, alleging that their blanket licensing method violated the Sherman Act. 15 U.S.C. $ 1; CBS v. ASCAP, supra, at 132. The performing rights associations offered television stations an annual license and a per program license, but CBS sought a method of licensing which reflected its actual use of music. They alleged that the blanket licensing system constituted an illegal tying or block-booking arrangement, in that the station was compelled to pay license fees for music it did not use, in order to license the music it wanted. The trial court found no anti-trust violations. Columbia Broadcasting System, Inc. v. American Society of Composers, 400 F. Supp. 737 (S.D.N.Y. 1975).

The court of appeals reversed, holding that the blanket licensing agreement constituted an illegal price-fixing device, because copyright owners received an artificial price through combining to sell their product. CBS v. ASCAP, 562 F.2d at 136. Price fixing may be legal when it is absolutely necessary for the market to function at all. Id. However, the court accepted the trial court's conclusion that television stations could negotiate directly for performing rights, and held that the price fixing scheme could not be saved by a "market necessity" defense. Id. at 140. See K-91, Inc. v. Gershwin Publishing Corp., 372 F.2d 1 (9th Cir. 1967) cert. denied, 389 U.S. 1045 (1968).

The agreements offered to state colleges and universities by the performing rights societies resemble in significant respects the blanket licensing agreements at issue in CBS v. ASCAP. They in fact offer less flexibility since there is no provision for per program or per performance licensing. Whether or not these agreements violate the anti-trust laws depends on the facts relating to the college

and university market for performing rights. Facts showing coercion would tend to prove illegal block booking, see 400 F. Supp. at 749-51, while facts showing the feasibility of direct negotiation would undermine the market necessity defense to price fixing. We do not resolve fact questions in the opinion process and cannot determine whether these agreements would constitute restraints of trade as a matter of law.

### SUMMARY

> State colleges and universities must secure the copyright holder's permission for their musical performances unless the performance is exempted by section 107 or 110 of the Copyright Revison Law of 1976. Payment of licensing fees to secure permission for such performances would not violate article 3, section 51 of the Texas Constitution. State institutions of higher education may pay for blanket licenses from performing rights societies if they receive adequate consideration for the payment. Whether or not the blanket licensing agreements violate the federal anti-trust laws is a fact question.

Very truly yours,

JOHN L. HILL
Attorney General of Texas

APPROVED:

DAVID M. KENDALL, First Assistant

C. ROBERT HEATH, Chairman
Opinion Committee

jsn