**Michael Patrick HEARN, Plaintiff,**

v.

**Susan E. MEYER and Harry N. Abrams, Inc., Defendants.**

**No. 84 CIV. 3422 (PKL).**

United States District Court, S.D. New York.

July 20, 1987.

---

Leon Friedman, New York City, for plaintiff.

Linden & Deutsch, New York City (David Blasband, of counsel), for defendants.

## OPINION & ORDER

LEISURE, District Judge:

The complaint in this action seeks monetary damages, recovery of printing plates and other printing materials, and other relief for alleged copyright infringement in connection with a book authored by defendant Susan Meyer and published in 1983 by

co-defendant Harry N. Abrams, Inc., entitled "A Treasury of the Great Children's Illustrators" ("Treasury"). Affidavit of Susan E. Meyer, sworn to on Oct. 22, 1985 ("Meyer Aff."), Exhibit 1 attached thereto. In particular, plaintiff Michael Patrick Hearn, the author of several books and a number of articles concerning children's illustrators, contends that certain reproductions in "Treasury" of original illustrations by W.W. Denslow and a photograph of Mr. Denslow, which were also reproduced in plaintiff's book, entitled "The Annotated Wizard of Oz", Affidavit of Michael Patrick Hearn, sworn to on Nov. 22, 1985 ("Hearn Aff."), Ex. 50, infringe plaintiff's copyright on his reproductions. In addition, plaintiff claims that "Treasury" copies other works of plaintiff, namely, his book, entitled "W.W. Denslow", Meyer Aff.Ex. 13, and his unpublished and incomplete manuscript entitled "The Pictured World", id. at Ex. 7, as well as six other articles written by plaintiff. Id. at Exs. 9–12, 20–21.

Defendants now move for summary judgment seeking the dismissal of plaintiff's claims. Defendants contend that their reproductions of plaintiff's reproductions of the originally published illustrations of W.W. Denslow do not constitute violations of the law of copyright because plaintiff's reproductions of Denslow's illustrations are not original and, therefore, are not copyrightable. Defendants also argue that, as a matter of law, the complaint should be dismissed because the written materials which purportedly have been infringed are not protected by copyright because they are statements of fact and/or ideas, and thus not original expression. Defendants also argue that, as a matter of law, there is no substantial similarity between their expressions, contained in "Treasury," and the passages that plaintiff claims have been infringed. For the purposes of this motion, defendants concede access to plaintiff's work. Plaintiff cross-moves for summary judgment on the his claims regarding the reproductions of the illustrations.

## DISCUSSION

The legal principles governing defendants' motion are well-settled. "[A] court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros. Inc. v. American Broadcasting Cos., Inc.*, 720 F.2d 231, 240 (2d Cir.1983) (citations omitted) (emphasis in original). *Accord Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986).

### A. Copyrightable Elements

When copyright infringement is alleged, "the analysis must first be to determine exactly what the [plaintiff's] copyright covers, and then to see if there has been an infringement thereof." *Axelbank v. Rony*, 277 F.2d 314, 317 (9th Cir.1960). The general rule is that "[a] copyright does not give to the owner thereof an exclusive right to use the basic material, but only the exclusive right to reproduce his individual presentation of the material." *Rochelle Asparagus Co. v. Princeville Canning Co.*, 170 F.Supp. 809, 812 (S.D.Ill.1959). See *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 193 F.2d 162, 164 (1st Cir.1951) ("[C]opyright on a work of art does not protect a subject, but only the treatment of a subject."), *aff'd*, 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276 (1952). *Cf. Walker, supra*, 784 F.2d at 50 (often-recurring themes not copyrightable "except to the extent they are given unique—and therefore protectible—expression in an original creation"). Accordingly, "the fact that the same subject matter may be present in two paintings does not prove copying or infringement." *Franklin Mint Corp. v. National Wildlife Art Exchange, Inc.*, 575 F.2d 62, 65 (3d Cir.), *cert. denied*, 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). "As Justice Holmes stated: 'Others are free to copy the original [subject matter]. They are not free to copy the copy.'" *Id.* (quoting *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 249, 23 S.Ct.

298, 299, 47 L.Ed. 460 (1903)). *Accord Time Inc. v. Bernard Geis Assocs.*, 293 F.Supp. 130, 141 (S.D.N.Y.1968).

### B. *Plaintiff Owns no Copyright in Copies of Public Domain Reproductions of Original Illustrations*

Plaintiff is the author of a book entitled "The Annotated Wizard of Oz" which contains reproductions, Color Plates XXII, XXVII and XLI, of three illustrations drawn by W.W. Denslow which were reproduced originally in the famous children's book, "The Wonderful World of Oz." Court Exhibits 1, 2 and 3. Plaintiff concedes that the reproductions of the original illustrations appearing in "The Wonderful World of Oz" are in the public domain, having been published originally in 1900. Plaintiff argues, however, that the reproductions of these illustrations appearing in his book "The Annotated Wizard of Oz" are entitled to their own copyrights as reproductions of works of art. Plaintiff alleges that defendants violated his purported copyright by making copies of his reproductions of the 1900 reproductions of the original illustrations. Defendants move for dismissal of this claim arguing that "[n]one of the illustrations ... upon which plaintiff sues are protected by copyright." Defendants' Memorandum of Law ("D.Memo.") at 16. In particular, defendants argue that plaintiff's work fails to satisfy " 'the one pervading element prerequisite to copyright protection regardless of the form of the work' ... the requirement of originality—that the work be the original product of the claimant." *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 489–90 (2d Cir.), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976) (quoting 1 M. Nimmer, The Law of Copyright § 10, at 32 (1975)).

The requirement of "originality" stems "from the fact that, constitutionally, copyright protection may be claimed only by 'authors.' " *L. Batlin, supra*, 536 F.2d at 490 (quoting U.S. Const., art. I, § 8; *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58, 4 S.Ct. 279, 281, 28 L.Ed. 349 (1884)). "Thus, '[o]ne who has slavishly or mechanically copied from others may not

claim to be an author.' " *L. Batlin, supra*, 536 F.2d at 490 (quoting 1 M. Nimmer, *supra*, § 6, at 10.2). Moreover, "[s]ince the constitutional requirement must be read into the Copyright Act, 17 U.S.C. § 1 *et. seq.*, the requirement of originality is also a statutory one." *L. Batlin, supra*, 536 F.2d at 490 (citing *Chamberlin v. Uris Sales Corp.*, 150 F.2d 512 (2d Cir.1945)). "It has been the law of this circuit for at least 30 years that in order to obtain a copyright upon a reproduction of a work of art ... that the work 'contain[s] some substantial, not merely trivial originality....' " *L. Batlin, supra*, 536 F.2d at 490 (quoting *Chamberlin, supra*, 150 F.2d at 513).

It is clear, therefore, that to rule upon any claim for infringement of copyright, the Court must explore the concept of originality. "Originality is, however, distinguished from novelty; there must be independent creation, but it need not be invention in the sense of striking uniqueness, ingeniousness, or novelty, since the Constitution differentiates 'authors' and their 'writings' from 'inventors' and their 'discoveries.' " *L. Batlin, supra*, 536 F.2d at 490 (citations omitted). "Originality means that the work owes its creation to the author and this in turn means that the work must not consist of actual copying." *Id.* (citations omitted).

The Second Circuit has noted that "[t]he test of originality is concededly one with a low threshold in that '[a]ll that is needed ... is that the "author" contributed something more than a "merely trivial" variation, something recognizably "his own." ' " *Id.* (quoting *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102–03 (2d Cir.1951)). However, as the Second Circuit has stated "[w]hile a copy of something in the public domain will not, if it be merely a copy, support a copyright, a distinguishable variation will...." *Gerlach-Barklow Co. v. Morris & Bendien, Inc.*, 23 F.2d 159, 161 (2d Cir.1927) (cited in *L. Batlin, supra*, 536 F.2d at 490). Finally, it is well settled that the foregoing principles are applicable to both reproductions of a work of art and works of art, themselves. "The requirement of substantial as opposed to trivial

variation and the prohibition of mechanical copying, both of which are inherent in and subsumed by the concept of originality, apply to both statutory categories." *L. Batlin, supra,* 536 F.2d at 490.

The Second Circuit has applied this standard in a wide variety of cases. It has held that "mass-produced commercial objects with a minimal element of artistic craftsmanship may satisfy the statutory requirement of such a work." *Id.* at 491 (citation omitted). Nevertheless, the Second Circuit has held that "the mere reproduction of a work of art in a different medium should not constitute the required originality...." *Id.* (quoting 1 M. Nimmer, *supra,* § 20.2 at 94). Moreover, the Court of Appeals has stated that "the requirement of originality [cannot] be satisfied simply by the demonstration of 'physical skill' or 'special training'.... A considerably *higher* degree of skill is required, true artistic skill, to make the reproduction copyrightable." *L. Batlin, supra,* 536 F.2d at 491 (emphasis in original). Finally, the Second Circuit has recognized that although "the test of 'originality' may leave a lot to be desired, ... it is the only one we have...." *Id.* at 492.

Mindful of the foregoing principles, the Court turns to the reproductions here in dispute. The Court examined the appearance of the reproductions contained in "The Annotated Wizard of Oz" and compared them to the original reproductions of the illustrations contained in "The Wonderful World of Oz." The Court agrees with plaintiff that:

> The "Witch of the North" plate in the Annotated Wizard is greener than the original and the witch's face has a deeper yellow. The colors in the "China" plate are lighter than the original which has a bluer sky and a deeper brown in Dorothy's dress. The cowardly lion is more brown in the reproduction than the original.

Plaintiff's Memorandum of Law ("P.Memo.") at 26; *see also* Hearn Aff. ¶¶ 57–58. The Court, however, does not share plaintiff's conclusion that "[t]hese variations enhance the copyrightability of the reproductions." P.Memo. at 26.

The Court notes that plaintiff does not claim that these insignificant variations were created intentionally. Moreover, plaintiff fails to argue—and this Court fails to see—how these minor variations express the plaintiff's own artistic viewpoint. In short, the Court finds that, at least with respect to the works' appearance, plaintiff's reproductions are mere slavish copies of W.W. Denslow's illustrations, as reproduced originally in "The Wonderful World of Oz." Accordingly, the Court concludes that the appearance of plaintiff's reproductions is clearly insufficient to vest them with copyright protection.

Deprived of the assistance of the appearance of his reproductions, plaintiff turns, as he must, to the alleged difficulty of the copying process, itself, as a way to satisfy the requirement of originality. Plaintiff claims that "the process by which he arranged for the reproduction of the five items at issue here involved a difficult, time-consuming and concentrated artistic effort to recreate the precise colors originally employed by Denslow in the first edition of the 'Wizard of Oz.'" P.Memo. at 22. Plaintiff noted the specific steps he took in order to produce the illustrations:

1. Photograph the key block from the original illustration, dropping all of the other colors.

2. Have each of the secondary colors hand-drawn on acetate which would require the tracings of the original plates in India ink or with coated mylar.

3. Then each secondary color had to be photographed individually, and each printed in one color only.

4. Then all the plates would be printed one on top of the other to give a variety of hue and color.

Plaintiff also described the process as follows:

> The work done by the various participants was long, time-consuming, and artistic in every sense of the word. The original drawings had to be retraced by hand in three separate stages to correspond to the three separate colors, red, yellow, and blue. Every bit of grass, every check on Dorothy's dress, every bit

of shine on the Tin Woodman's body had to be redrawn with pen and ink on acetate and sometimes twice or more if it involved a secondary color, green, orange or brown, because these colors were created only by the printing of two primary colors on top of one another.... This was time consuming, exacting work because no overlapping of colors could be accepted; any overlapping would result in peculiar rather than pure secondary colors. These errors could only be seen when the proofs of the separations were made, and if any errors were discovered, again retracing by hand was required to align all carelessnesses.

Hearn Aff. ¶ 60.

In support of his attempt to cast the above described effort in a manner which would satisfy the originality requirement, plaintiff relies heavily on *Alfred Bell & Co., Ltd. v. Catalda Fine Arts, Inc.*, 74 F.Supp. 973 (S.D.N.Y.1947), *aff'd* 191 F.2d 99 (2d Cir.1951); *Millworth Converting Corp. v. Slifka*, 276 F.2d 443 (2d Cir.1960); and *Alva Studios, Inc. v. Winninger*, 177 F.Supp. 265 (S.D.N.Y.1959).

In *Alfred Bell*, plaintiff, "a British print producer and dealer, ... copyrighted in the United States eight mezzotint engravings of old masters produced at its order by three mezzotint engravers." 74 F.Supp. at 974–75.[1] Plaintiff brought the action against "a color lithographer, a dealer in lithographs and the dealer's president, [who] produced and sold color lithographs of the eight mezzotints." *Id.* at 975. It was undisputed that the subjects of the eight engravings were all well known works of art all in the public domain. *Id.* In finding that defendants had violated plaintiff's copyright, the District Court held that:

> The work of the engraver upon the plate requires the individual conception, judgment and execution by the engraver on the depth and shape of the depressions in the plate to be made by the scraping process in order to produce in this other medium the engraver's concept of the effect of the oil painting. No two engravers can produce identical interpretations of the same oil painting. This would appear to be sufficient to meet the requirement of some originality [footnote omitted] to entitle a work to the protection of the copyright law.

> \* \* \* \* \* \*

> Of course, the ideas for the subject are entirely those of the first artist, the painter. What is original with the engraver is the handling of the painting in another medium to bring out the engraver's conception of the total effect of the old master. The engraver is not trying to alter or improve on the old master. He is trying to express in another medium what the original artist expressed in oils on canvas.

> It is only this treatment in another medium which is original, but it is a distinguishable effect which can itself be

---

1. The District Court described the mezzotint engraving process as follows:

   > The ... process is performed by first rocking a copper plate, that is, drawing across the plate under pressure a hand tool having many fine and closely spaced teeth. The tool is drawn across the plate many times in various directions so that the plate is roughened by the process. The outlines of the engraving are then placed upon the plate either by tracing with carbon paper from a photograph of the original work which it is desired to reproduce in this medium or by a tracing taken from such a photograph on gelatine sheets transferred to the copper plate by rubbing carbon black or some similar substance in the lines of the tracing on the gelatine sheet and transferring of them by pressing the sheet upon the copper plate. With the image on the roughened plate the engraver then scrapes with a hand tool the picture upon the plate, obtaining light and shade effects by the depth of the scraping of the roughened plate or ground. When the plate is completed, trial prints are taken from it and it may be altered to make the final result to the satisfaction of the engraver. When it is completed and a satisfactory proof drawn from the plate, a thin steel coating is applied to it to preserve it during the printing of the final article, of which several hundred may be drawn from such a steel-faced plate before noticeable wearing of the plate.... The color may be applied to the plate by the artist, but usually is done by one or more printers who follow a sample print or color guide in applying the colored ink in the depressions made by the engraver on the plate.

   74 F.Supp. at 975.

copied by photography. The engraver's contribution to the world's art is indeed modest, but it is his own and should be protected.

*Id.* at 975–76.

The Second Circuit affirmed. The Court of Appeals noted that the mezzotints " 'originated' with those who made them, and ... amply met the standards imposed by the Constitution and the statute." 191 F.2d at 104. The Second Circuit then noted:

"Again, an engraver is almost invariably a copyist, but although his work may infringe copyright in the original painting if made without the consent of the owner of the copyright therein, his work may still be original in the sense that he has employed skill and judgment in its production. He produces the resemblance he is desirous of obtaining by means very different from those employed by the painter or draughtsman from whom he copies: means which require great labour and talent. The engraver produces his effects by the management of light and shade, or as the term of his art expresses it, the *chiarooscuro.* The due degrees of light and shade are produced by different lines and dots; he who is the engraver must decide on the choice of the different lines or dots for himself, and on his choice depends the success of his print."

*Id.* at 104–05 n. 22 (quoting Copinger, The Law of Copyrights (7th ed. 1936) 46).

Plaintiff contends that:

The description of the mezzotint process matches precisely what was done in this case. Instead of working on copper, the modern artisan works with pen and ink on acetate. But he must hand-draw each and every mark that must be reproduced in a single color. Indeed in this case it had to be done two or three times. Every color had to be traced or redrawn individually on acetate. Primary colors were printed on top of each other to make secondary colors. Proofs had to be pulled at every stage to check the register and density of color. There was constant redrawing and reapplication of

mylar—the gummed plastic that indicates the color. The process took over a year.

P.Memo. at 25.

Plaintiff also seeks support from *Millworth Converting* in which Judge Friendly held that plaintiff was entitled to copyright a three-dimensional embroidered effect based on a public domain two-dimensional fabric design. Judge Friendly, relying on *Alfred Bell,* noted that the plaintiff "offered substantial evidence that its creation of a three-dimensional effect, giving something of the impression of embroidery on a flat fabric, required effort and skill." 276 F.2d at 445. Accordingly, the Second Circuit found that "plaintiff's contribution to its reproduction of this design sufficed to meet the modest requirement of a copyright proprietor 'that his work contains some substantial, not merely trivial, originality....' " *Id.* (quoting *Chamberlin, supra,* 150 F.2d at 513).

Finally, plaintiff cites *Alva Studios* as support for his claim of originality. In *Alva Studios,* plaintiff was engaged in the business of reproducing "three-dimensional works of art, the originals of which [were] owned by various museums throughout the United States and several foreign countries." 177 F.Supp. at 266. Plaintiff worked "in collaboration with the museum which [owned] the particular work being reproduced, and the curatorial staff of each such museum [exercised] close control over the quality and detail of a scaled reproduction of its sculpture works." *Id.* Defendant was "engaged in the business of manufacturing and selling decorative accessories." . *Id.*

The subject of the dispute in *Alva Studios* was plaintiff's reproduction of Auguste Rodin's sculpture, "Hand of God." Plaintiff copyrighted its reproduction; it then sued defendant for infringement because defendant was copying plaintiff's Rodin replica and marketing products embodying this copying through retail operation. It was undisputed that the original sculpture was in the public domain.

The District Court first examined whether plaintiff satisfied the requirement of

originality. The Court found that plaintiff had done so because:

> [Plaintiff's] copyrighted work embodies and resulted from its skill and originality in producing an accurate scale reproduction of the original. In a work of sculpture, this reduction requires far more than an abridgment of a written classic; great skill and originality is called for when one seeks to produce a scale reduction of a great work with exactitude.
>
> \* \* \* \* \* \*
>
> The originality and distinction between the plaintiff's work and the original also lies in the treatment of the rear side of the base. The rear side of the original base is open; that of the plaintiff's work is closed. We find that this difference when coupled with the skilled scaled sculpture is itself creative.

177 F.Supp. at 267. In addition, the Court found "that the granting of approval by the Carnegie Institute's Department of Fine Arts, experts in the field, to be extremely persuasive that the plaintiff's copyrighted work is in itself a work of art which bears the stamp of originality and of skill." *Id.* at 267. Accordingly, the Court found that plaintiff's work was original.

The Court has examined the aforementioned cases and finds that although, at first blush, they appear to support plaintiff's position, careful scrutiny and analysis reveals them to be inapposite. In *Alfred Bell* the District Court's finding of originality was based primarily on plaintiff's conversion of the original art work, oil paintings done on canvas, to mezzotint engravings. The District Court emphasized that "[w]hat is original ... is the handling of the painting in another medium.... It is only this treatment in another medium which is original...." 74 F.Supp. at 976. Moreover, in *Millworth Converting* the Court based its finding of originality on plaintiff's conversion of a *two-dimensional* fabric design into a *three-dimensional* embroidered effect. Finally, in *Alva Studios,* the District Court based its finding of origi-

nality on more than just the skill of the artisan doing the reproduction; the District Court noted that it took great creativity, as well as skill, to interpret, project and transpose the original Rodin work, in order to create a scale model thereof. In addition, the Court relied on substantial differences in the appearance between the reproduction and the original. Finally, the District Court based its finding of originality on the accrediting of the reproduction by an expert.

In the instant action, plaintiff has not reproduced W.W. Denslow's illustrations in another medium or form. It is undisputed that the original illustrations were previously reproduced in the first edition of "The Wonderful World of Oz" and a scrapbook of the "Wizard of Oz" musical. The publisher of "The Wonderful World of Oz" was the first to reproduce W.W. Denslow's illustrations for a book. Plaintiff's contribution is merely the reproduction of the original reproductions.[2] Moreover, although it is undisputed that plaintiff expended great effort and time in reproducing the reproductions of W.W. Denslow's illustrations, such effort and time, alone, are not sufficient for a finding of originality. Accordingly, the Court finds that, as a matter of law, plaintiff's reproductions of the 1900 reproductions of W.W. Denslow's illustrations are not original and are therefore, not copyrightable.

Plaintiff's last claim for the copyrightability of his reproductions of the reproductions of W.W. Denslow's original illustrations stems from the alleged public benefit he has provided by making available to the public reproductions of rarely seen reproductions of original illustrations. It is undisputed that the original W.W. Denslow drawings are unavailable. It is also agreed that the original edition of "The Wonderful World of Oz" is a "rare work" and difficult to find in libraries. Therefore, plaintiff argues that his reproductions should be protected under the copyright law. Plaintiff also suggests that "defendants could

---

2. There is no evidence in the record regarding the skill and effort exercised by the original publisher in reproducing W.W. Denslow's illus-trations for "The Wonderful World of Oz." Presumably, such effort and skill was equal to that allegedly displayed by plaintiff.

have avoided the entire problem if they had bothered to find original illustrations by Denslow, as plaintiff Hearn did.... All they have to do is find the originals themselves, rather than appropriating the work of plaintiff here." P.Memo. at 32.

Although the Court agrees with plaintiff that, to some extent, defendants, and the public, have benefited from plaintiff's work, this, in and of itself, does not mandate copyright protection for the work. There are equally sound policy reasons—regarding these concededly rare and public domain reproductions of original illustrations—which militate against plaintiff's position. Plaintiff must not be permitted to "monopolize rights to reproduce what are concededly rare and public domain illustrations, and hence restrict public access to them." D. Reply at 12. As the Second Circuit noted:

> Absent a genuine difference between the underlying work of art and the copy of it for which protection is sought, the public interest in promoting progress in the arts —indeed, the constitutional demand, *Chamberlin v. Uris Sales Corp., supra,* —could hardly be served. To extend copyrightability to miniscule variations would simply put a weapon for harassment in the hands of mischievous copiers intent on appropriating and monopolizing public domain work.

*L. Batlin, supra,* 536 F.2d at 492. Thus, the alleged public benefit conferred by plaintiff is not dispositive of this question.

Accordingly, the Court finds that plaintiff's reproductions—contained in his "Annotated Wizard of Oz"—of the reproductions of W.W. Denslow's illustrations—contained in the original version of "The Wonderful World of Oz"—do not satisfy the originality requirement under copyright law. Plaintiff's reproductions, therefore, are not protected, as a matter of law, by copyright. Plaintiff's claims in connection with said reproductions are thus dismissed.[3]

## C. *Plaintiff lacks Standing to Sue with respect to the Denslow Book*

Defendants contend that plaintiff lacks standing to bring any claim relating to any infringement of a book he co-authored, entitled "W.W. Denslow", because plaintiff is not the legal owner of the copyright nor can he be considered a beneficial owner of such a right. Plaintiff counters that because he owns a reversionary interest in the copyright—that is, the copyright will be reassigned to him once, if ever, the current stock of books held by the publisher, and holder of copyright, are sold—he retains a beneficial interest in that work sufficient to maintain his claims with respect to the work.

Section 501(b) of the 1976 Copyright Act provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). "A beneficial owner of an exclusive right includes 'an author who ha[s] parted with legal title to the copyright in exchange for percentage royalties based on [sales] or license [fees].'" *Jones v. Virgin Records,* 643 F.Supp. 1153, 1156 (S.D.N.Y.1986) (quoting H.R.Rep. No. 1476, 94th Cong., 2nd Sess. 159 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5775).

In *Cortner v. Israel,* 732 F.2d 267 (2d Cir.1984) the Second Circuit first put forward the above definition. In *Cortner,* plaintiffs assigned their musical composition and all rights therein to ABC in exchange for ABC's obligation to pay royalties. *Id.* at 269. The Second Circuit held that the composer's contingent right to receive royalties constituted a sufficient beneficial interest to give them standing to seek relief under both the 1909 and 1976 Copyright Acts. *Id.* at 271.

In the instant case, it is undisputed that plaintiff is not the legal owner of the copyright. The copyright registration for "W.W. Denslow" is actually in the name of the publisher, Clarke Historical Library of

---

3. Plaintiff does not make any argument concerning the fourth illustration, a black and white pen-and-ink self-portrait of W.W. Denslow and a photograph of the illustrator. Accordingly, plaintiff's claims with respect to these works are also dismissed. Meyer Aff.Exs. 27 and 29.

Central Michigan University ("Clarke Historical"). Moreover, it is also undisputed that plaintiff was not a signatory to the contract between Clarke Historical and plaintiff's co-author Professor Douglas G. Greene—the publisher preferred to have only Professor Greene sign. Meyer Aff.Ex. 16. Defendants do not deny that plaintiff was paid one-half of the $1,000 honorarium which the publisher paid to Professor Greene under the publication agreement. Defendants note, however, that the honorarium was the only compensation paid to the authors under the agreement; the authors' request for royalties was rejected by the publisher. In 1980, *id.* at Ex. 17, and again at the time this action was commenced, *id.* at Ex. 18, plaintiff and Professor Greene unsuccessfully requested the publisher to revert rights in the work to them.

Plaintiff's claim of standing is based on the contents of a letter written by his counsel—subsequent to the commencement of this action and signed by plaintiff, plaintiff's counsel and a representative of Clarke Historical—which allegedly reflects the original agreement between the publisher and the authors. *Id.* at Ex. 19. In the letter, plaintiff concedes that "[i]n the original contract with the authors, there was no provision for the payment of royalties on the first printing of the book." *Id.* Plaintiff, however, states that the publisher "did agree with the authors that *if* a second printing of the work was run off, *some* provision would be made for the payment of royalties." *Id.* (emphasis added). In addition, Clarke Historical agreed that "*if* it decided not to do a second printing, it would assign all rights to the work including the copyright to the authors after all copies of the first printing were sold." *Id.* (emphasis added).

■ These undisputed facts fail to establish a present interest in the work. They merely indicate that the publisher has agreed with the authors to (1) negotiate a royalty arrangement if, and when, the publisher reprints the book; or (2) to assign the copyright to the authors if, and when, the first printing of the book has sold out

and the publisher decides not to reprint. Defendants point out that the "latter event will surely not take place in the foreseeable future, given the sales history of the book." D.Memo. at 21. It is undisputed that despite the fact that "relatively few copies of the work were printed, the publisher reported in 1980 that 713 copies were still on hand [Meyer Aff.Ex. 18]. Five years later, in 1985, the publisher still had 600 copies on hand [Meyer Aff.Ex. 19]." D.Memo. at 21.

Plaintiff, however, insists that the mere possibility of a reverter, no matter how remote, satisfies the requirement of beneficial interest. Plaintiff relies, in part, on his belief that the Copyright Act of 1976—in which Congress states that "the legal *or* beneficial owner" of a copyright can bring an action—indicates that Congress wanted to eliminate "the arcane legal principles that limited the right of the author to bring suit in his own name when his work was infringed by others, even if copyright was held in the name of the publisher." P.Memo. at 35. Plaintiff also relies on *Wales Indus. Inc. v. Hasbro Bradley, Inc.,* 612 F.Supp. 510, 517 (S.D.N.Y.1985) (Weinfeld, J.) as support for his broad view of § 501(b). Neither of these suggested pillars of support withstands close examination.

In *Cortner,* the Second Circuit interpreted the 1976 Copyright Act as a "mere[ ] codifi[cation of] the case law that had developed under the 1909 Act with respect to the beneficial owner's standing to sue." 732 F.2d at 271. The Court of Appeals quoted approvingly Professor Nimmer's statement "that the 1976 codification of the standing of beneficial owners 'follows the law established by the courts under the 1909 Act.'" *Id.* (quoting 3 *Nimmer on Copyright* § 12.02). Accordingly, the *Cortner* Court held that it is irrelevant to the question of "standing to sue for infringement of [a] beneficial interest in [a] copyright ... whether the case is governed by the 1909 Copyright Act or the 1976 Copyright Act." *Cortner, supra,* 732 F.2d at 271. Thus, plaintiff's reliance on some purported expansions of the concept of ben-

eficial ownership under the 1976 Act is unfounded.

Plaintiff's reliance on *Wales Indus., supra*, 612 F.Supp. at 517 is similarly misplaced. In *Wales Indus.*, defendant, who had received an assignment of copyright from a Japanese manufacturer for a period of three years, had counter-claimed for copyright infringement. Plaintiff sought the dismissal of the counterclaim arguing that the Japanese manufacturer was an indispensable party who should be joined in the action. Judge Weinfeld held that "joinder of [the Japanese manufacturer] as a party to the action is desirable." *Id.* Construing the joinder provision of § 501(b) of the 1976 Copyright Act, Judge Weinfeld noted that it is within the "discretion [of] the Court to 'require the joinder ... of any person having or claiming an interest in the copyright.'" *Id.* (quoting 17 U.S.C. § 501(b)). Judge Weinfeld also noted that joinder was advantageous from a policy perspective because otherwise the plaintiff would be vulnerable to multiple actions and the risk of inconsistent judgments. *Id.*

Nowhere in *Wales Indus.* does Judge Weinfeld discuss "beneficial ownership." Moreover, he does not identify the Japanese manufacturer as a "beneficial owner." Nor does Judge Weinfeld inquire into the question of standing. Moreover, this Court agrees with defendants that "[i]f Congress had intended to apply the more liberal joinder requirement [discussed by Judge Weinfeld in *Wales Indus.*] to standing to sue, it could easily have done so. Rather, it established two separate standards within the very same section of the statute." Defendants' Reply Memorandum of Law ("D. Re-

ply") at 16. Accordingly, this Court finds *Wales Indus.* inapposite.

In addition, the Court holds that the cases concerning beneficial ownership of copyright—under both the 1909 Act and the 1976 Act—do not support plaintiff's broad view of the concept. In *Cortner*, the Second Circuit noted that plaintiffs had the right to royalties contingent only on the legal owner's exploitation of the work. 732 F.2d at 270. The Second Circuit held that although the legal owner "had the right not to exploit the property, the parties clearly contemplated that it would do so, as indeed it did, resulting in the payment of royalties to the" plaintiffs. *Id.* The Second Circuit concluded that "[u]nder these circumstances we are satisfied that [plaintiffs] right to royalties, [contingent only on the legal owner's 'good faith' exploitation of the work,] gave them a sufficient beneficial interest in the copyright to give them standing to seek judicial relief under the copyright law against infringement, both under the 1909 Copyright Act, *see Manning v. Miller Music Corp.*, 174 F.Supp. 192 (S.D.N.Y.1959), and under the 1976 Act, 17 U.S.C. § 501(b)." *Id.* at 270–71.[4]

In *Manning, supra*, 174 F.Supp. at 192, plaintiffs—composers of a musical piece—claimed that they were beneficial owners of the work. They based their claim of beneficial ownership on rights they had reserved by express agreement with the legal owner of the copyright.

The rights reserved to the plaintiffs by the agreement include[d] (1) the right to receive royalties; (2) a restriction on assignment of certain rights by the publisher, such as motion picture rights, without plaintiffs' consent; (3) limitation[s] on

---

**4.** The Court notes, however, that Judge Winter, although concurring in the result reached by the panel in *Cortner*, objected strongly "to the inclusion in the opinion of the discussion of whether these particular plaintiffs have a sufficient beneficial interest in the original copyright to allow them to bring infringement actions." *Id.* at 272 (Winter, J., concurring). As Judge Winter stated:

The discussion is entirely unnecessary to the ruling on the judgment and is thus gratuitous dicta. To purport to rule on this question is particularly inappropriate since the issue is hotly contested and has no governing prece-

dent in this court. It is also a complex issue of some importance, involving the interrelationship of two pieces of legislation enacted some sixty-seven years apart and governing the rights of many authors of intellectual property. I by no means suggest that Judge Mansfield's discussion reaches an erroneous conclusion, but, should the issue arise again, I shall not regard myself as bound by anything said in the present case.

*Id.* at 272–73. Accordingly, it is probable that *Cortner* represents the broadest interpretation of the concept of beneficial ownership by the Second Circuit.

publishers' right to grant block or bulk licenses without the consent of the Songwriters Protective Association of which plaintiffs [were] members; (4) restriction[s] on the publisher's right to grant licenses for television or for new purposes without plaintiff's written consent; (5) the right for a limited period to secure reassignment of the song and copyright if it [were] not made productive by the publisher; (6) specific reservation of renewal rights; (7) the right to share in any damages recovered in any infringement action.

*Id.* at 195 (footnote omitted). In *Manning,* the Court found that plaintiffs were beneficial owners, but, in doing so, the Court relied on the full array of the aforementioned rights as "indicative of the close and rather unusual relationship between the parties." *Id.* at 196 n. 4. In contrast, in the case at bar, plaintiff lacks all of the above rights, except that—contingent upon the slimmest of possibilities—of obtaining the copyright.

*Bisel v. Ladner,* 1 F.2d 436 (3rd Cir.1924) also fails to support plaintiff's claim of standing. In *Bisel,* an author sued his publisher, the legal owner of the copyright. Plaintiff claimed entitlement to royalties from a revision of the work issued by the publisher. The Court of Appeals affirmed the district court's determination that the revision was not improperly issued. Nevertheless, the Circuit Court held that the author was entitled to royalties thereon. This case, moreover, is also distinguishable from the case at bar because in *Bisel* the action arose from a dispute between author and publisher, not between a third party and the author. Furthermore, in *Bisel* the author actually had rights to royalties from the exploitation of his work.

*Ted Browne Music Co. v. Fowler,* 290 F. 751 (2d Cir.1923) is also inapposite. In *Ted Browne* a publisher brought an action against the author. The author had sold his song to the publisher. Subsequently, the author registered the song in his own name and purported to assign rights to the song to a third party. The Circuit Court held that the publisher—the assignee of *all* rights in the song—was the beneficial owner, despite the fact that legal title was held in the name of the author. *Ted Browne* is distinguishable from the case at bar because the publisher, held to be a beneficial owner, was entitled to all rights in the work while the legal owner, the author, owned no rights. In the instant action, the publisher, in addition to being the legal owner, also owns all rights in the work and should, therefore, be considered the beneficial owner, as well.

Finally, *Goodis v. United Artists Television, Inc.,* 425 F.2d 397 (2d Cir.1970), the last case cited by plaintiff in support of his standing argument, is distinguishable from the instant action. In *Goodis,* the author of a novel sued a television producer for copyright infringement. The defendant contended that the work was in the public domain because it was published in a magazine carrying a copyright notice solely in the name of the magazine and not the author, and the magazine was purportedly only a licensee of limited serial publication rights in the novel. The Court of Appeals held that the copyright notice in the name of the magazine was adequate to protect the author. Accordingly, the Court did not reach questions of standing or beneficial ownership. Moreover, even if the case were read in such a manner, the Court notes that the author had retained all rights in his novel with the exception of the magazine serialization rights, in clear contrast to the case at bar.

This Court must reject plaintiff's standing argument, not only because it lacks support in the case law, but also because, if accepted, said argument "would make every author a beneficial owner, as in virtually all cases where an author or his statutory successors could possibly recapture a copyright." D. Reply at 17. Under the statutory scheme, works created before 1978 receive an initial copyright term of 28 years. 17 U.S.C. § 304(a). Such term can be renewed for a 47–year period. *Id.* Moreover, if the author does not expressly grant rights during the renewal period, the rights in the work revert to him for that period. *See Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 63 S.Ct.

773, 87 L.Ed. 1055 (1943); 2 *Nimmer on Copyright* §§ 9.02, 9.06 (1985). Notwithstanding any express assignment of the renewal rights, if the author fails to survive the vesting of the renewal period, the renewal rights revert to his statutory successors. *See Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960). Moreover, even where the grantee acquired rights to renew the copyright, the author or his statutory successors can still recapture the copyright for the final 19 years of the renewal terms. 17 U.S.C. § 304(c). For works created in 1978 and thereafter, the author or his statutory successors can recapture the copyright 35 years after the date the copyright grant was made, or if the grant covered the right of publication, 35 years from the date of publication or 40 years from the date of the grant, whichever period ends earlier. 17 U.S.C. § 203.

The plain meaning of this statutory scheme is that, in almost all cases, there is the possibility that the author or his statutory successors will regain the copyright. It is reasonable to infer, as do defendants, that "[i]f Congress, obviously aware of the statutory mechanisms for reversion it was simultaneously [enacting], had intended that the [mere] possibility of reversion was alone sufficient to confer standing [on an author], it would have either replaced the statutory term 'beneficial owner' with 'author,' or added the term 'author' in specifying parties having standing." D. Reply at 18. Moreover, Congress would have at least been expected, "in lieu of setting forth a limited example that a 'beneficial owner' would include 'an author who had parted with legal title to the copyright in exchange for percentage royalties on sales or license fees,' should have stated that every author, because he may regain a copyright he has conveyed, is a beneficial owner." *Id.* (citation omitted). Instead, Congress used a particular kind of author as an example—one who retained a present financial interest in exploitation of his work.

For the above stated reasons, this Court finds that only the publisher possesses a present interest in the work and therefore only the publisher can be damaged by the infringement of the book. If the publisher has a basis for a claim regarding the work it need only bring an action. The Court agrees with defendants that "[they] should not be put in the position of defending against separate litigation by two purported owners...." D.Memo. at 21. Accordingly, the Court finds that plaintiff is not a beneficial owner of the copyright to the work entitled "W.W. Denslow" and therefore, he lacks standing to sue for injury caused by alleged infringement of the copyright of this work. Plaintiff's claims in connection with "W.W. Denslow" are thus dismissed.

D.  *Defendants are Entitled to Summary Judgment on Plaintiff's Copying Claims with respect to the Text of his Works*

To prove infringement, a plaintiff holding a valid copyright "must show that his [work] was 'copied,' by proving access and substantial similarity between the works, and also show that his expression was 'improperly appropriated,' by proving that the similarities relate to copyrightable material." *Walker, supra*, 784 F.2d at 48 (citations omitted). Defendants do not ask this Court—in connection with the aforementioned claims—to determine any issue of copying or access. Instead, defendants concede, for the purposes of this motion, that defendants had access to all of plaintiffs' writings and that plaintiff's works were the source of each of the accused statements.

The Court of Appeals for the Second Circuit has set forth a two-part test for similarity under the rule of *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir.1946). *Walker, supra*, 784 F.2d at 51. The *Arnstein* test draws "a distinction between noninfringing 'copying,' on the one hand, which may be inferred from substantial similarities between the two works, and infringing 'illicit copying,' on the other, which demands that such similarities relate to protectible material." *Id.*

Under *Arnstein*, 'the trier of the facts must determine whether the similarities

are sufficient to prove *copying.* On this issue, analysis ("dissection") is relevant, and the testimony of experts may be received.... If copying is established, then only does there arise the second issue, that of *illicit copying* (unlawful appropriation). On that issue ... the test is the response of the ordinary lay [observer]; accordingly, on that issue, "dissection" and expert testimony are irrelevant.'

*Id.* (quoting *Arnstein,* 154 F.2d at 468) (emphasis added in *Walker*). The "ordinary observer" or "lay audience" test inquires whether an average lay observer would " 'recognize the alleged copy as having been appropriated from the copyrighted work.' " *American Greetings Corp. v. Easter Unlimited, Inc.,* 579 F.Supp. 607, 614 (S.D.N.Y.1983) (citation omitted). *Accord Past Pluto Productions Corp. v. Dana,* 627 F.Supp. 1435, 1443 (S.D.N.Y. 1986).

Plaintiff claims that hundreds of specific passages contained in the written text of his works were copied and paraphrased in defendants' "Treasury." Moreover, plaintiff also alleges that the structure of "Treasury" was taken from plaintiff's—unfinished and unpublished—"The Pictured World." In addition, plaintiff claims that the selection and ordering of certain information, facts and quotations contained within plaintiff's work were taken by defendants.

Defendants, however, urge the Court to dismiss plaintiff's claims on the following grounds:

1. Plaintiff can claim no copyright in the materials which he has copied from other works.

2. Plaintiff can claim no copyright in statements of fact or ideas which he has not stated in an original form of expression.

3. Plaintiff can claim no copyright in expressions where the facts discussed can only be expressed in a limited number of ways.

4. Defendants have not infringed plaintiff's text where [defendants'] expression of the same fact or idea is different from that of plaintiff.

D.Memo. at 31. Moreover, with respect to plaintiff's claims regarding plot, organization and/or structure, defendants contend that plaintiff cannot copyright a historical theory or interpretation. In addition, defendants argue that the organization and structure of plaintiff's work is a common literary device and hence is also not copyrightable. Defendants also dispute plaintiff's allegation that the structure of "Treasury" is similar to that of "The Pictured World." Finally, defendants argue that "The Pictured World" is not a compilation and therefore, the cases holding such compilations copyrightable are inapposite.

### 1. *The Passages*

Plaintiff claims that "[t]here are over 250 passages which were either taken or paraphrased by [defendants] from [plaintiff's] work." P.Memo. at 11.[5] Plaintiff sets forth each allegedly infringing passage and then analyzes it to determine whether such passage could have come from an alternative source. *See* Hearn Aff.Ex. 7. The Court has carefully reviewed each passage and has determined that in most cases the passages are not copyrightable because they are (1) verbatim quotes from the works of another; (2) statements of pure fact; and/or (3) statements of fact which, a reasonable finder of fact could hold only, can be expressed in a limited number of ways. With respect to most of the remaining passages, the Court finds that no reasonable trier of fact could determine that there is sufficient similarity between the *protectible* aspects of these passages and those of defendants which are allegedly infringing to constitute a copyright violation.

### a. *Verbatim Quotations*

■ No copyright can be claimed in the verbatim reproduction of the statements of quotations of others. *Harper and Row Publishers, Inc. v. Nation Enterprises,*

---

**5.** The Court notes that of these 250, 45 are contained in "W.W. Denslow" and, therefore,

plaintiff does not have standing to bring an infringement claim thereon.

471 U.S. 539, 544, 105 S.Ct. 2218, 85 L.Ed.2d 588, 225 U.S.P.Q. 1073, 1076 (1985); *Suid v. Newsweek Magazine,* 503 F.Supp. 146, 148 (D.D.C.1980); 17 U.S.C. § 102. Of the 205 passages[6] in dispute, 22 are not copyrightable because they are verbatim quotations from the works of others.[7] For example, passage Greenaway–13 reads that "He wished her shoes 'weren't quite so like mussel-shells'...." The allegedly infringing passage reads "... her feet were like 'mussel-shells'...." However, plaintiff's passage is a direct quote from E.T. Cook and Alexander Wedderburn, *The Letters of John Ruskin,* 307 (1909), where the authors note that " 'He wished her shoes "weren't quite so like mussel-shells," her roses "like truffles," her "suns and moons like straw hats," her lilies "crumpled like handkerchiefs," ' ." Another example of plaintiff's attempt to sue for infringement upon a passage based on a verbatim quote from another author is Crane–25. Crane–25 states: "He finally demanded either a higher fee or at least a small royalty, and when the publishers refused both, he discontinued the series." The allegedly infringing passage reads "... when the publishers refused to renegotiate a contract that would give Crane royalties—instead of the flat fees they had paid previously— Crane went on to illustrate different kinds of children's books...." However, plaintiff's passage is clearly lifted from Walter Crane's, "Notes on my own Books for Children," printed in *The Junior Bookshelf,* 15 (October 1940) which reads "... Crane demanded that the publisher give him either a higher fee or at least a small royalty." A final illustration of plaintiff's attempt to claim infringement on non-copyrightable

passages of text is Caldecott–15. Plaintiff's passage reads: "For all his drawings, Caldecott relied on 'my indelible brown ink bottle....' " Defendants' allegedly infringing passage reads "For drawing he preferred using brown ink." However, plaintiff concedes that the source of his passage, for which he claims copyright protection, is *Yours Pictorially: Illustrated Letters of Randolph Caldecott,* New York and London, 1976, 117 (M. Hutchins ed. 1976) which reads " '... Caldecott relied on "my own indelible brown ink bottle...." ' "[8] Accordingly, because these 22 passages are in no way original to plaintiff, they are not copyrightable and cannot form the basis for an infringement action.

### b. *Statements of Pure Fact*

■ It is well settled that facts are not copyrightable. *See, e.g., Financial Information, Inc. v. Moody's Investors,* 751 F.2d 501, 504 (2d Cir.1984); *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1368 (5th Cir.1981); *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 974, 979 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 309 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). "What is protected is 'the author's original expression of particular facts....' " *Financial Information, supra,* 751 F.2d at 505 (quoting *Hoehling, supra,* 618 F.2d at 974). Of the remaining passages upon which plaintiff has, in part, brought this action, many[9] are not entitled to the protection of copyright law because they are statements of pure fact, without

---

**6.** Although plaintiff claims that defendants infringed 250 of his passages, 45 of those passages are contained within "W.W. Denslow"; this Court has held already that plaintiff lacks standing to sue in connection with this work.

**7.** The 22 passages are as follows: Greenaway— 3, 4, 11, 13, 15, 16 and 20; Crane 1, 14, 15, 16, 25, 31 and 33; Potter—18; Caldecott—3, 15, 18 and 24; Tenniel—2 and 3 and Rackham—6. The passages are all found in Hearn Aff.Ex. 7. The numbers refer to the numbers given to each item by the artist discussed within Hearn Aff.Ex. 7.

**8.** Caldecott–15 is also illustrative in that it demonstrates that certain of plaintiff's passages are not copyrightable for more than one reason. Caldecott–15 is also not copyrightable because it is a statement of pure fact. It is a fact that Caldecott preferred using brown ink.

**9.** Passages which this Court finds to be pure fact are: Lear–3; Tenniel–2, –3; Crane–3, –21; Caldecott–1, –2, –5, –11, –15; Miscellanea–2, –9, –10, –13, –15, –16, –17, –18, –24, –25; Greenaway–14, –21, –26, –40; Potter–1, –5, –6, –8, –14, –15, –16, –18; Nielsen–1, –6, –8; W.W. Denslow– 1, –2, –3, –4.

any trace of originality in expression. For example, Miscellanea–17 reads: "... the book was being published at the author's own expense." The allegedly infringing passage reads "The author Lewis Carroll published *Alice's Adventures in Wonderland* at his own expense." The Court finds that plaintiff's statement is one of pure fact and is accordingly not copyrightable. Similarly, Caldecott–2 is another example of a pure factual statement. Plaintiff's passage reads "Throughout his life, he suffered from a weak heart and tuberculosis...." Defendants' allegedly infringing passage states: "Throughout his life, Caldecott waged a constant battle with ill health...." For fear of belaboring this point, the Court will cite only one further example, Lear–3. Plaintiff's passage reads: "... this twentieth child of a family...." Defendants' allegedly infringing passage states "He was the twentieth child born in the family...." Accordingly, these passages also cannot support a copyright infringement claim.

### c. *Facts Which Can Only be Expressed In a Limited Number of Ways*

■ It is well understood that authors wishing to express ideas within the context of a factual background often can choose from only a limited number of terms. Copyright protection is afforded rarely where a fact permits only a narrow continuum or spectrum of expression. *See, e.g., Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984); *Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678 (1st Cir.1967). There are numerous passages [10] in plaintiff's works which plaintiff claims have been infringed but which are nevertheless unprotected because they concern facts which a reasonable fact finder could only find could be expressed in a limited number of ways. Moreover, the Court also finds that a reasonable fact finder could find only that those similarities which do exist between defendants' passages and those written by plaintiff stem, not merely from the substantive nature of the passages, but also from the fact that the parties used identical materials as the sources for their passages. For example, at Tenniel–1 plaintiff's passage reads: "... the first sentiment expressed by his heroine in *Alice in Wonderland* is 'What is the use of a book without pictures or conversations?'" Defendants' allegedly infringing passage reads "'And what is the use of a book without pictures or conversations?' wondered Alice.... in the very first paragraph of *Alice's Adventures in Wonderland*...." The Court notes that the passages are almost identical. However, it is clear that there is only a limited number of ways to express this fact—the location of this quote in *Alice in Wonderland*. A more complicated example can be found at Lear–5. Plaintiff's passage reads: "Originally treated as just another member of the household staff, made to eat with the other servants, Lear was soon invited upstairs to dine with the family once it was learned how delightfully he entertained the numerous boys and girls ... with his spontaneous sketches and verses." Defendants' allegedly infringing passage states "Early ... at Knowsley, Lear was treated as a member of the staff and took his meals ... with the servants. Before long, Lord Derby noticed that the children were dashing from the dinner table to ... where the young artist would greet them with his rhymes and drawings. Discovering this, the Earl promptly invited Lear to join the rest of the family for dinner upstairs...." Again, the Court notes that these passages, describing factual occurrences, are similar. Nevertheless, the Court finds that plaintiff's passage is not infringed by that of defendants', not only because the essence of the latters' passage is factual, but also because the similarity stems from the use by the parties of a common source. The

---

**10.** Those passages are as follows: Lear–1, –4, –5, –12; Tenniel–1, –8, –9, –11, –12, –16; Caldecott–4, –6, –7, –8, –9, –14, –19, –20, –21, –24, –25, –27; Miscellanea–7; Potter–4, –5, –7, –9, –10, –14, –21, –22; Greenaway–7, –8, –9, –11, –12, –23, –25, –30, –32; Crane–2, –6, –8, –9, –10, –11, –19, –22, –26, –29, –31, –34, –35; Dulac–4, –5, –9, –10, –14; Nielsen–3, –4, –5; Rackham–1, –11, –14, –16.

common source reads as follows "It was through his grandsons that the Earl heard that Lear was in the house, for he began to realize that instead of sitting with him after dinner as they had always done they were slipping away as soon as they politely could; and when he asked them why this was they told him that the young man in the steward's room who had come to draw animals was such good company that they were going down to visit him. If he is such good company, said Lord Derby, then the young man shall come and dine upstairs with us." V. Noakes, *Edward Lear: The Life of a Wanderer*, 42 (1968). A third example of factually-based similar passages which the Court does not find infringing is Lear–12. Plaintiff's passage reads: "One of these excerpts *Illustrated Excursions in Italy* (1846) caught the eye of Queen Victoria who invited the artist to give her drawing lessons." Defendants' purportedly infringing passage states "... his second book, *Illustrated Excursions in Italy*, impressed Queen Victoria so greatly that she invited Lear to give her ... drawing lessons in 1846." Again both of these passages state facts for which only a limited manner of expression is possible. Moreover, the Court finds that the similarity of expression is also due to the use of a common source by the parties. The passage in *Edward Lear: The Life of a Wanderer* reads: "The first volume of 'Illustrated Excursions in Italy' came out in April.... And its publication had a worthy outcome—for Lear was summoned by the Queen. Her Majesty had seen the book and so admired it that she wanted Lear to give her lessons in drawing." Noakes, *supra*, at 71. The Court will provide one final example, found at Caldecott–7, to illustrate this point. Plaintiff's passage reads: "Although he had never done a picture book before...." Defendants' purportedly infringing passage reads "... although the artist had never done children's books...." There can be no doubt that these passages are similar. However, they merely express the fact that the subject

artist had never done a children's book. Such a statement of fact cannot be protected by the law of copyright.

### d. *Lack of Substantial Similarity*

"Although the issue of substantial similarity is clearly a factual one," after comparing the works at issue, a court may properly grant summary judgment for defendants " 'on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity.' " *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 918 (2d Cir.1980) (quoting 3 Nimmer § 12.10 at 12–70). In other words, "the lack of substantial similarity between the *protectible* aspects of the works [must be] 'so clear as to fall outside the range of disputed fact questions' requiring resolution at trial." *Walker, supra*, 784 F.2d at 48 (emphasis added) (citation omitted). *See also Arthur v. American Broadcasting Cos., Inc.*, 633 F.Supp. 146, 148 (S.D.N.Y. 1985). In a court's comparison, "the works themselves supersede and control any contrary allegations of the parties." *Decorative Aides Corp. v. Staple Sewing Aides Corp.*, 497 F.Supp. 154, 157 (S.D.N.Y.1980) (citation omitted), *aff'd*, 657 F.2d 262 (2d Cir.1981). Professor Nimmer was of the opinion that

> [u]pon such motions by a defendant the courts must guard against a tendency to assume that the nature of the similarity between the two works indicates that in fact copying did not occur. Such motions should be granted only if the court finds that assuming copying, any similarity between the works is insubstantial.

3 Nimmer § 12.10 at 12–71 to 12–72.

After careful examination the Court also holds that a reasonable finder of fact could not but find that at least 34 of the passages [11] in dispute are not substantially similar because the ideas or facts conveyed therein, or the means of expressions used to communicate said ideas or facts, are different. For example, in Caldecott–26, plaintiff's passage reads: *"The Queen of*

---

11. The passages are as follows: Lear–7; Tenniel–6; Crane–2, –9, –13, –22, –32, –33; Caldecott–9, –10, –12, –13, –18, –21, –26, –30, –31; Miscellanea–1, –6; Greenaway–15, –16, –17, –25, –27, –28, –30, –32, –34, –36, –37; Rackham–12, –17; Nielsen–7, –11.

*Hearts* is only a dozen lines long, and yet this artist broadened the story to fill a thirty-page picture book." Defendants' allegedly infringing passage states: "A few lines of verse were embraced by a series of pictures...." Another example can be found at Miscellanea–6. Plaintiff's passage reads: "Again the seemingly trivial phrases are accompanied by the most fantastic of pictures ... found by the artist as excuses to include such fine watercolor sketches which were likely drawn for some other occasion." Defendants' allegedly infringing passage states: "Arthur Rackham preferred to illustrate the indescribable, to use the text merely as a hint at pictures that were meant to exist independently of the words." The final examples this Court will present to illustrate the failure of plaintiff to demonstrate substantial similarity between passages of his work and those of defendants are found at Greenaway–15, and –16. Plaintiff's passages read: "Her plainness distressed her a bit...." "It hurt her that she was not in actuality what her art suggested her to be...." In contrast, defendants' passages state: "... Kate Greenaway was dowdy and plain...." "It may seem odd, perhaps, that the illustrator of these sweet children in quaint costumes was so absent of style herself...." In short, it is obvious to this Court that plaintiff's passages—although dealing with the same artists as the passages written and published by defendants—are expressing different ideas in different ways than the allegedly infringing passages of defendants. Accordingly, the Court finds that these passages of defendants are sufficiently dissimilar from those written by plaintiff that no reasonable finder of fact could find infringement. Thus, plaintiff's claims of infringement based on the alleged copying of these passages are dismissed.

### e. *The Remaining Passages*

There are a few remaining passages that do not clearly fall under any of the aforementioned categories for excluding plaintiff's work. Nevertheless, the Court finds that these passages, even if found to infringe plaintiff's copyright, are *de minimis*

and would not support a copyright claim. *See, e.g., Rosemont Enterprises, supra,* 366 F.2d at 306. Accordingly, plaintiff's claims of copyright infringement based on copying of specific passages is dismissed.

### 2. *Defendants are Entitled to Summary Judgment on Plaintiff's Taking Claims in Connection with the Plot, Structure and/or Organization of "The Pictured World"*

Plaintiff claims that defendants copied the plot, structure and/or organization of his unpublished manuscript, "The Pictured World." Defendants move for summary judgment seeking the dismissal of these claims on the following grounds. First, defendants argue that although plots can be protected by copyright in works of fiction, the law in the Second Circuit is clear that an interpretation or theory of an historical event is not copyrightable as a matter of law. Second, defendants contend that the structure of "The Pictured World" is neither complicated nor uncommon. Rather, defendants suggest that, in organizing his work, plaintiff has employed a standard literary device that is not copyrightable. Third, and last, defendants argue that no reasonable finder of fact could hold that the structure of defendants' work, "Treasury" is similar to that of "The Pictured World." Moreover, defendants contend that plaintiff's and defendants' works were clearly created for different audiences. Plaintiff's tone and approach is scholarly; defendants' work, on the other hand, is allegedly directed to and meant to entertain a general audience. Furthermore, defendants note that "The Pictured World" is organized by grouping a number of artists together in chapters defined by artistic categories, for example, "Nursery Aesthetics" and "Modern Masters." Defendants' work is divided into chapters, each chapter dedicated to a single artist. Finally, while defendants' work discusses illustrators solely from England and the United States who worked from the 1840's until the early twentieth century, "The Pictured World" was intended to cover the entire history of illustration, from its his-

torical origins to the present. "The Pictured World" discusses European artists in addition to the Americans and Englishmen discussed in "Treasury."

For reasons which are set forth below, the Court finds that all of defendants' aforementioned arguments are meritorious. Accordingly, plaintiff's claims regarding the plot, structure and/or organization of his work are hereby dismissed.

With respect to the copyrightability of history, the Second Circuit Court of Appeals has stated clearly that

> The copyright provides a financial incentive to those who would add to the corpus of existing knowledge by creating original works. Nevertheless, the protection afforded the copyright holder has never extended to history, be it documented fact or explanatory hypothesis. The rationale for this doctrine is that the cause of knowledge is best served when history is the common property of all, and each generation remains free to draw upon the discoveries and insights of the past. Accordingly, the scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain.... [A]bsent wholesale usurpation of another's expression, claims of copyright infringement where works of history are at issue are rarely successful.

*Hoehling, supra,* 618 F.2d at 974.

In *Hoehling,* plaintiff, the author of a book about the German zeppelin, the Hindenberg, claimed that defendants, another author who wrote an account concerning the Hindenberg and a motion picture studio which produced a movie on the same topic, infringed the essential plot of plaintiff's book. The Second Circuit held that where "the idea at issue is an interpretation of an historical event, our cases hold that such interpretations are not copyrightable as a matter of law." *Id.* at 978. The Second Circuit pointed out that

> In *Rosemont Enterprises,* [*supra,* 366 F.2d 303]; we held that the defendant's biography of Howard Hughes did not infringe an earlier biography of the re-

clusive alleged billionaire. Although the plots of the two works were necessarily similar, there could be no infringement because of the "public benefit in encouraging the development of historical and biographical works and their public distribution." *Id.* at 307; *accord, Oxford Book Co. v. College Entrance Book Co.,* 98 F.2d 688 (2d Cir.1938). To avoid a chilling effect on authors who contemplate tackling an historical issue or event, broad latitude must be granted to subsequent authors who make use of historical subject matter, including theories or plots. Learned Hand counseled in *Meyers v. Mail & Express Co.,* 36 C.O. Bull. 478, 479 (S.D.N.Y.1919), "[t]here cannot be any such thing as copyright in the order of presentation of the facts, nor, indeed, in their selection."

*Hoehling, supra,* 618 F.2d at 978 (citing *Gardner v. Nizer,* 391 F.Supp. 940 (S.D.N.Y.1975); *Fuld v. National Broadcasting Co.,* 390 F.Supp. 877 (S.D.N.Y.1975); *Greenbie v. Noble,* 151 F.Supp. 45 (S.D.N.Y.1957); 1 *Nimmer on Copyright* § 2.11[A] (1979); Chafee, *Reflections on the Law of Copyright: I,* 45 Colum.L.Rev. 503, 511 (1945)).

As this Court has previously noted, the *Hoehling* Court also made it abundantly clear that facts are not copyrightable and that the Second Circuit does not " 'subscribe to the view that an author is absolutely precluded from saving time and effort by referring to and relying upon prior published material.... It is just such wasted effort that the proscription against the copyright of ideas and facts.... are designed to prevent.' " 618 F.2d at 979 (quoting *Rosemont Enterprises, supra,* 366 F.2d at 310). Finally, however, the Second Circuit added one cautionary note to the effect that "courts may lose sight of the forest for the trees. By factoring out similarities based on non-copyrightable elements, a court runs the risk of overlooking wholesale usurpation of a prior author's expression.... Thus, in granting or reviewing a grant of summary judgment for defendants, courts should assure themselves that the works before them are not

virtually identical." *Id.* at 979–80. Keeping in mind the above principles, the Court turns to the works now in dispute.

### a. The "Plot" of "The Pictured World" is not Copyrightable

■ The Court finds first that plaintiff cannot copyright the "plot" or "story" of "The Pictured World." Plaintiff's work deals solely with historical subject matter and interpretations thereof. To the extent "The Pictured World" has a plot or story, it is derived solely from the lives of the various artists discussed in the work. Thus, this case falls squarely within the standards set forth under *Hoehling.* Accordingly, in order to give "broad latitude ... to subsequent authors ... mak[ing] use of historical subject matter, including theories or plots," *id.* at 978, this Court must dismiss, as a matter of law, plaintiff's claim that defendants' infringed the plot of "The Pictured World."

### b. The Structure of "The Pictured World" is not Copyrightable

■ The overall structure of "The Pictured World" is not copyrightable. The four completed chapters of the work are organized according to theme. Within each of the chapters, plaintiff groups various artists. He then connects the illustrators' works through a single narrative. For example, Chapter 4 of "The Pictured World", entitled "The Revolt of Nonsense: George Cruikshank and his Contemporaries", discusses, *inter alia,* John Tenniel and Edward Lear. The discussion of Edward Lear begins on page 72 of this 117 page chapter, and ends on page 76. Plaintiff then covers John Tenniel from page 77 through page 84 of the same chapter. There is nothing distinctive about such a structure for a historical work. The plan for the entire work, which is as yet uncompleted, is also fairly standard. It appears that plaintiff plans to trace the development of illustration from its origin to the present. Again, such a thematic presenta-

tion, structured chronologically, is not copyrightable.

### c. The Structure of "Treasury" is Not Substantially Similar to the Structure of the "Pictured World"

■ The Court's finding above that plaintiff is not entitled to copyright protection for the overall structure of "The Pictured World" notwithstanding, the Court also finds that no reasonable fact finder could determine that the overall structure of "Treasury," and that of each of its chapters, is similar to that of "The Pictured World." Unlike plaintiff's work, the chapters of "Treasury" are organized by artist, not by theme or school. Moreover, the Court notes that each chapter in "Treasury" is organized in the most basic and logical of literary formats. Each chapter commences with a short summary of the artist—placing the illustrator in the context of the artistic and social climate of his or her times; next, each chapter turns to the life of the artist in a standard chronological sequence. For example, in the chapter of "Treasury" concerning Walter Crane, defendants discuss the illustrator's childhood, his early career, his important relationship with Edmund Evans and the artist's later career. The chapter culminates with a summary of his artistic and personal accomplishment. Such a structure is not only standard, it is also logical. Accordingly, the Court holds that no reasonable fact finder could find that the structure of plaintiff's work, "The Pictured World"—even if copyrightable—is similar to that of "Treasury."

### d. Plaintiff's Selection and Presentation of the Facts Contained within "The Pictured World" are not Copyrightable

■ Under The Copyright Act of 1976, 17 U.S.C. § 102,[12] and the law of this Circuit, an author can secure a copyright in the structuring of materials and the mar-

---

**12.** Section 101 defines a "compilation" as follows:

　　a work formed by the collection and assembling of preexisting materials or of data that

are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. 17 U.S.C. § 101.

shalling of facts contained in a factual compilation. *See, e.g., Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir.1984) and *Financial Information, supra,* 751 F.2d 501, 506. In *Eckes,* the Second Circuit, focusing on the language of the Copyright Act, "selected, coordinated, or arranged," upheld the copyrightability of a baseball card guide referring to 18,000 or so different baseball cards because the authors exercised "selection creativity and judgment" in choosing 5,000 of them as "premium cards." The Court of Appeals noted that:

> [W]e have been particularly restrictive in the protection of non-fiction works indicating, for example, that the fruits of another's labor in lieu of independent research obtained through the sweat of a researcher's brow, does not merit copyright protection absent, perhaps, wholesale appropriation....
>
> Nevertheless, our cases do not hold that subjective selection and arrangement of information does not merit protection.

736 F.2d at 862. Moreover, in *Financial Information,* the Second Circuit—while remanding to the trial court the inquiry of whether an aggregation of financial data constituted a copyrightable compilation—held that the "questions to be addressed will include whether the data used on [plaintiff's] cards involved a modicum of selection, coordination, or arrangement on [plaintiff's] part, sufficient to meet the rather broad copyrightability standard of originality which is phrased in terms of 'independent creation' rather than the narrower, inapplicable standards of 'uniqueness' or 'novelty' or 'ingenuity,' [citations omitted]." 751 F.2d at 507.

Plaintiff argues broadly that these cases support his copyright claim because defendants

> took the selection and ordering of the facts in [plaintiff's] work, including the many quotations that plaintiff found from original sources which [defendants] appropriated. [Plaintiff] does not own a copyright in any individual fact or quote, but he does own a copyright in their collection together. If [defendants] appropriated that collection—which [plaintiff] assert[s] and defendants do not challenge here—than [sic] the overall claim of infrigement [sic] on the individual passages is greatly enhanced.

P.Memo. at 47–48.

■ Plaintiff's reliance on *Eckes* and *Financial Information* as support for the aforementioned argument is misplaced. Those cases involved compilations of raw data—similar to directories or lists. The question asked by the courts was whether this aggregation of pure data involved such selectivity on the part of the compiler to constitute originality. In the instant case, plaintiff's works are not compilations of data. Instead they are works of historical and artistic interpretation more properly analyzed under the approach formulated in *Hoehling, supra,* 618 F.2d 972. Accordingly, plaintiff's claim based on the "compilation" theory is also dismissed.

### CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment seeking the dismissal of plaintiff's complaint is granted. Plaintiff's cross-motion is denied. Accordingly, plaintiff's complaint is dismissed in its entirety.

SO ORDERED.